STATE v. ED. McKINNON and TOM JOHNSON.

(Filed 23 October, 1929.)

**1. Homicide G a—Evidence of guilt of first degree murder held sufficient to be submitted to jury in this case.**

Circumstantial evidence that the deceased was killed with a stick identified as that carried by one of the defendants; that at the time of the killing the deceased had large amounts of money on his person; that neither of the defendants had money immediately before, but had money thereafter on the night of the killing, with circumstances tending to show a division of the particular money of which the deceased was robbed, and the identity of the pocket-book of the deceased as that seen soon after the killing in the possession of one of the defendants, foot tracks of two persons, one identified as having been made by the boots of one of the defendants; that one of the defendants was seen talking to the deceased just before the killing, is *held,* with other circumstantial evidence in this case, sufficient to be submitted to the jury and to sustain a verdict of guilty as to both defendants of murder in the first degree, the one as the actual perpetrator of the crime and the other as aiding and abetting therein.

**2. Criminal Law I j—Upon motion of nonsuit all evidence should be considered in light most favorable to the State.**

Upon defendant's motion as of nonsuit (C. S., 4643), made after the close of the State's evidence and renewed after the close of all the evidence, all the evidence which tends to prove the defendant's guilt will be considered in the light most favorable to the State, and in this case *held:* the evidence, although circumstantial, raised more than a conjecture, scintilla or suspicion, and was sufficient to be submitted to the jury, the probative force being for them.

**3. Criminal Law G d—Error, if any, in the admission of certain testimony in this case cured by testimony of other witnesses to same effect.**

Where the identity of the defendant and the loss by the deceased of his pocket-book on the day of the crime have been established by the testimony of competent witnesses, incompetent testimony of another witness to these facts thus established is immaterial under the facts of this case, and the admission of the incompetent testimony is not held for reversible error.

**4. Criminal Law I g—Refusal of requests for instruction substantially given in charge is not erroneous.**

Where the requests for instruction by the defendant are substantially contained in the charge, the refusal of the trial court to give the particular instructions requested will not be held for error.

**5. Same—Inadvertence in charge as to contentions of party should be called to the attention of the court in apt time.**

Where the judge in his charge to the jury inadvertently misstates a contention of the defendant in one particular, the inadvertence should be called to his attention before the jury retires, and under the circumstances of this case where the judge warned the jury not to be governed by his recollection, but by their own, the appellant's assignment of error in this respect cannot be sustained.

**6. Criminal Law C a—One aiding and abetting commission of murder is guilty as principal.**

One who is present when another commits a capital felony with the knowledge of the other, and does some act to render aid in the perpetration of the crime, is guilty of the offense as an aider therein, though he takes no direct share in its actual commission, and when present advising, instigating or encouraging the other to commit the crime, is guilty as an abetter therein.

APPEAL from *Daniels, J.,* and a jury, at July Term, 1929, of DUPLIN. No error.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*D. M. Jolly for Ed. McKinnon.*

*D. L. Carlton and Murray Allen for Tom Johnson.*

CLARKSON, J. The defendants were convicted of the murder, in the first degree, of J. H. Boney, and sentenced by the court below to be electrocuted. The State's evidence tended to prove that J. H. Boney was a strawberry grower, 66 years old, living near Tin City, in Duplin County. He had a great many negro strawberry pickers who came from nearby places to pick strawberries, among them the defendant, Ed. McKinnon. He furnished the pickers houses to live in. On Thursday, 25 April, 1929, J. H. Boney was discovered dead about 11 o'clock at night, at the rear end of his pack-house or barn, about 25 yards back of his house, face down in a mud hole. No pocket-book was found on him. He had $6.60 in change in his pocket—two or three bills and some silver. "When found he had been dead about two or two and a half hours." He was struck six times, first across the head and cut in the head about three and a half inches and struck on the back and cut another about three and a half inches on the back of the head; both jaws were struck on each side and he was struck on the neck and across the arm. There was not a whole bone in his head. The physician who examined him said "the wounds were made with a blunt instrument—a blunt smooth instrument, in my opinion. It could have been made with a stick like this," the stick introduced in evidence found near the body with hair and blood stains on it.

*The evidence to connect two being present when the crime was committed:* About 30 feet from the body a stick was found where it was thrown in some dog fennel which was holding it up, with Boney's hair on it and stains of blood. "Tracks led from the body in the direction of the stick, one with shoes and one with rubber boots, two men's tracks. After passing the tracks led across the edge of the strawberry patch" towards the shanty where McKinnon stayed. Did not go with the path, "but went across the field four feet apart running side by side." The boots admitted by McKinnon to be his, "put one boot in the track, and it fit as fine as you ever saw."

*The evidence to connect Ed. McKinnon with the crime:* Boney had a brown folding pocket-book, like one shown on the trial bought at the same store. On Wednesday before he was killed on Thursday night, he lost this pocket-book in the strawberry patch where Ed. McKinnon and the other negroes were picking berries at the time. It was in evidence that McKinnon asked how much money was lost and was told $800. The pocket-book was found by his son about 3 o'clock in the afternoon—an hour after it was lost. It contained about $800, mostly $20 and $10 bills, and a peculiar gold coin. His son would haul the berries and give his father the money. Boney was seen by his son at 6 o'clock, about dark, 50 or 75 yards from his house, on the evening he was killed, and had the pocket-book in his pocket with a stack of strawberry checks, when his

son went with others to the river, about three miles away, to fish. Some of the women pickers stayed in the barn, or pack-house, in the edge of the yard; they lived upstairs and the stables were underneath. About 200 to 300 yards, almost directly behind the pack-house in the woods, Ed. McKinnon stayed in a shanty—two rooms. The women in one, men in the other. About 6 o'clock the evening Boney was killed, McKinnon was at Hall filling station with a stick in his right hand exactly like the one which was found near the body, which when found had hair and blood stains on it. "I saw him as much as 2 or 3 times with that very stick." He wore at the time overalls, rubber boots and wide-brim hat. Before that day he wore a wide-brim hat and a handkerchief around his neck, and the negroes called him "cow boy." He was without money that evening; had lost his money and was going to borrow some from Boney, and was seen going in the direction of Boney's house about 6 o'clock in his boots and overalls. Early next morning after the killing, witnesses testified: "Tracks led from the body in the direction of the stick, one with shoes and one with rubber boots—two men's tracks. After passing the tracks led across the edge of the strawberry patch" towards the shanty where McKinnon stayed. Did not go with the path, "but went across the field four feet apart running side by side." The boots admitted by McKinnon to be his "put one boot in the track and it fit as fine as you ever saw." The tracks were followed to within 75 or 100 yards of the shanty. Boney was knocked down in a mud hole. Rubber boots were found about twenty steps from where the path led out to the front of the shanty. The woods were back of the shanty and the boot tracks twenty steps from the woods. McKinnon was at the shanty when they were found and said he pulled them off and left them there as he dressed to go to the picture show the evening before. "I turned a boot over with my foot and there was some red clay on it. It looked like blood, but it was not blood, but pure red clay from off that hill." McKinnon, on his return from the movie with the negro girls, about 11:30 o'clock that night, was at Boney's and heard the tale of the crime, but did not go near the body, but went immediately to the shanty. Witnesses who slept in the shanty said that McKinnon came in the night of the killing; "heard him burst the latch from the door as he came in," and said that Mr. Boney was dead; some one killed him; he did not know who did. "I believe I will leave," and he was advised not to do so. When he came in something was in his hand; "looked like a paper rolled up; it was brown." Another witness said "It looked like a pocket-book and was the color of that one." He had a black pocket-book in his hand; "it was a long one and opened on one side; had no money in it." McKinnon "had a splinter in his hand and fired it when he came in the house." Search was made and no money or pocket-book was found in the house or on McKinnon, who was arrested early next morning.

STATE *v.* McKINNON.

A rural policeman testified that defendant, Tom Johnson, made a voluntary statement to him. "He said he was over in the field adjoining some woods on the Boney farm; seems like it was a fish pond, and said that Ed. McKinnon came on. It was the night of the murder. He followed Ed. McKinnon thinking he had some whiskey, and when he walked up to Ed. McKinnon in the woods he had five or six piles of money; looked like $100 to the pile. He asked him where he got it, and McKinnon said he got it off his boss man, and said McKinnon promised to give him some if he would not tell it, and about that time there was a rustle in the bushes and McKinnon thought somebody was coming, and grabbed it and got all but one pile and he, Tom Johnson, grabbed the other pile, and put three $10 bills in his socks and carried the other and put it in his trunk, and then he heard the officers were going to search the house and he was advised by George McCray to move it out, and he moved it out and put it in a pile of stove wood near the house, and when he went back for it it was gone. He said that George McCray was the only one who knew where it was. I (the rural policeman) asked him for the gold money, and he said that after he found out they were looking for it, he decided that he had better throw it away, and threw it in a branch near the house. Tom (Johnson) said he was lying on the ground with the other money when McKinnon ran, and that he picked up $90 in all."

*Evidence to connect Tom Johnson with the crime:* He did not work for Boney, but picked strawberries a week and a half on another nearby farm. He had no money, and left the next day after the killing, after paying his employer one dollar he had borrowed from him. "Tracks led from the body in the direction of the stick, one with shoes and one with rubber boots—two men's tracks. After passing the tracks led across the edge of the strawberry patch" towards the shanty where McKinnon stayed. Did not go with the path, "but went across the field four feet apart and running side by side." The boots admitted by McKinnon to be his "put one boot in the track and it fit as fine as you ever saw." Johnson testified that he saw McKinnon "over in the edge of the field adjoining some woods on the Boney farm." Got some $90 in all. He threw the piece of gold coin away. Boney's daughter testified this was a peculiar coin given her father, and one like it given her, while on a trip through Maryland, with a Bible verse on it like the one shown in evidence. Witnesses testified to the peculiar make when seen in Johnson's possession and like the one Boney's daughter had and shown in evidence. A witness testified: "I live at Lumber Bridge and know Tom Johnson. I picked berries for Mr. Boney; left on Monday night before he was killed on Thursday night. I saw Mr. Boney with a gold coin like that; kept it in his pocket-book; brown folding book, like that one you have.

On Friday night Tom Johnson came to my house at Lumber Bridge. My husband and I had retired. Tom Johnson came there about 3 o'clock Friday night and said 'It's on at Tin City.' He said that Mr. Boney got killed, and he sat on the edge of the bed and pulled out three $10 bills; one of them was green on one side and yellow on the other, and he ran down in his pocket and pulled out two 50-cent pieces and a gold piece. It looked like that one. My husband asked him where he got that money, and he said he throwed his boss man for it, and he said that George McCray stole $90 from him. Tom said he was going to Fayetteville and buy a pistol and come back and kill George, and he went on to tell how long the stick was, and said that Mr. Boney had been hit six times. He said the stick was that long, and big at one end and little at the other. He said he knew who killed him, and if he had to tell it he would tell it."

Prior to and at 8:10 o'clock the night of the killing, Tom Johnson was there talking to Boney at the rabbit pen, between his house and the pack-house. That night at the show at Wallace "I saw Tom Johnson with two pockets full of money, but I don't know how much he had." There were others who saw him that night at the show and hobby-horses with money in bills. Johnson said he started to the show from Tin City about 8:30 to 9 o'clock. It was in evidence that the sun set on 25 April, 1929, at 6:40 p.m.

Both the defendants denied that they killed Boney. McKinnon introduced evidence tending to show that he was at the moving picture show in Wallace at the time Boney was killed. It took about a half hour to walk from the pack-house to the movie at Wallace—from Boney's house to Wallace was about one and one-fourth miles. McKinnon's party of negro girls had gone on before. McKinnon had gone to the shanty to change his clothes and overtook them; he then had on tennis shoes and light grey hat. The show opened at 8:15 to 8:30, and McKinnon and his crowd were a few minutes late. One of the negro girls who stayed in the pack-house, testified, speaking of McKinnon: "I asked him if he was going to the show, and he said he had lost his money, and if he could borrow some money he was going to the show. He said he was going to borrow some money from Mr. Boney. He went back and dressed, and stayed too long, and we went and left him, and he got mad about it. He went back home, saying he was going to borrow some money and dress, and stayed too long, and we went on and he caught us at the last house at Tin City and went on to the show; he was running when he caught up with us. He was drinking when he caught up. I asked him what was the matter, and he said he was tired; that he had been drinking a little bit." McKinnon testified that he only had $1 that night and in telling people in the shanty about Boney being killed he

was not excited. He also explained the circumstances relied on by the State, and denied what Johnson testified to in regard to the money.

It was the contention of the State that Boney was killed between 8:30 and 9:00 o'clock; that McKinnon killed him, and Johnson was present aiding and abetting him; that McKinnon robbed him, threw the stick in the dog fennel patch, and they both ran towards the shanty and divided the money hurriedly in the woods; McKinnon left his rubber boots near the shanty, quickly changed his clothes and put on tennis shoes and caught up with the negro girls running, and they entered the movie late. The distance from the shanty was only a little over one and one-fourth miles to the movie. Johnson went to the movie that evening and was seen with two pockets full of money, which he testified he got from McKinnon, which was before he (Johnson) went to the movie. That night on his return with the negro girls, about 11 o'clock, McKinnon did not go to where Boney's body was lying, but went to the shanty immediately, burst the door of the shanty open, showed a pocket-book like Boney's and wanted to leave after telling about Boney being killed, but was persuaded not to do so.

The defendants, at the close of the State's evidence, and at the close of all the evidence, moved to dismiss the action or for judgment of nonsuit. C. S., 4643. These motions cannot be sustained.

"On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. 'An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the introduction of his own evidence does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt.' S. v. Earp, 196 N. C., at p. 166. See S. v. Carlson, 171 N. C., 818; S. v. Sigmon, 190 N. C., 684. The evidence favorable alone to the State is considered—defendant's evidence is discarded. S. v. Utley, 126 N. C., 997. The competency, admissibility and sufficiency of evidence is for the court to determine, the weight, effect and credibility is for the jury. S. v. Utley, supra; S. v. Blackwelder, 182 N. C., 899. The evidence in the case was circumstantial." S. v. Lawrence, 196 N. C., at p. 564.

The evidence, though circumstantial, is sufficient to be submitted to a jury. It is more than a conjecture, a suspicion or a scintilla—the probative force is for the jury.

In regard to the evidence against McKinnon, as to every link in the chain of circumstances the court below recited the evidence pro and con and charged the jury: "If you are so satisfied beyond a reasonable doubt,

then you would consider that circumstance, otherwise you would disregard it," and charged "These are the circumstances relied upon by the State as to McKinnon, and our law lays down certain rules governing juries in the consideration of circumstantial evidence. Our Court has said that circumstantial evidence is a necessary and useful means for the ascertainment of truth. But it says further that the juries shall consider against the defendant, no circumstance unless it is established to their satisfaction, from the evidence beyond a reasonable doubt. They shall take all the circumstances that they find to be so established, and take them together, and if they lead their minds to a moral certainty or beyond a reasonable doubt of his guilt, then they will convict. But this other rule is laid down, that if the jury can explain the circumstances upon any other reasonable theory, than that of the guilt of the defendent, it is their duty to do so, in the interest of human life."

In regard to the circumstantial evidence against Johnson, the evidence was recited by the court below and the charge was as follows: "These are circumstances, upon which the State relies for the conviction of Tom Johnson, and I give you the same charge as I gave you in regard to the circumstantial evidence in reference to McKinnon. Treat these circumstances the same way. Consider only those that you find to be established beyond a reasonable doubt. Consider them together, and if they lead you to a moral certainty or beyond a reasonable doubt as to his guilt, you will convict. If not, you will acquit. If you can explain the circumstance alleged against Johnson by any other reasonable theory, other than that of guilt, it is your duty to so explain them." We think the charge is fully sustained by authorities in this jurisdiction.

The contention of defendant McKinnon is mainly as to the sufficiency of evidence. The exceptions and assignments of error as to the witness testifying as to the loss of the pocket-book, we think, immaterial. She testified, "The pocket-book was lost in the field, but I don't know what day it was. Q. Did you know it was lost? They said it was lost." The testimony that followed showed beyond question that it was lost and found the day of the killing and McKinnon knew it. Nor to the testimony of the witness in describing the man in Tin City the afternoon before Boney was slain. In answer to the question he said, "He was about the same size and he had on boots and a pair of overalls. He was dressed like they said he was; I just noticed that." The witnesses that had testified prior identified both McKinnon and the stick positively.

The contention of defendant Johnson, is the refusal to give the following instructions: "1. If the jury should find from the evidence that the defendant, Tom Johnson, saw a man out in the road in front of him, and knew who he was, and he whistled at him and he ran out into the edge of the woods and found him counting some money, and the man

took fright and ran, leaving a part of the money, and the defendant Tom Johnson picked up the money and appropriated it to his own use, the said defendant would not be guilty of any crime, unless it was for larceny and receiving. 2. If the jury believe from the evidence that Tom Johnson followed the defendant, Ed. McKinnon, out into the edge of the woods and found him counting money, and Ed. McKinnon took fright at some noise he had heard and left part of the money he could not be guilty of higher offense than the crime of receiving stolen property."

We think this request was given substantially in the charge as follows: "The defendant, Tom Johnson, could not be convicted upon this bill of indictment, if you are satisfied of the truth of his evidence that he went into the woods and found somebody there with money, who said that it had been found and that the man ran away and he picked it up and carried it off. If that is true, that would not even constitute a circumstance against him. You might find that he might be guilty of receiving stolen money, but he is not indicted for larceny." The court below, in regard to Johnson, stated: "The State contends that he was seen in the yard of Mr. Boney at 8:10 the night of the homicide. Mr. Thompson, son-in-law of Mr. Boney, testified to that, and Johnson himself admits that." Johnson, defendant, contends that not only did he not admit that he was with Mr. Boney at 8:10 the night of the homicide, but expressly denied this fact in the following language: "I was not sitting on the rabbit-box talking to Mr. Boney at ten minutes past 8 o'clock the night he was killed. It was not me he was talking to. If Mr. Thompson said he saw me there he is mistaken. I was there in the afternoon part, or first part of the evening. George McCray and all of us boys left there together. Mr. Thompson did not see me. I used to go nights to see my girl. I heard Mr. Boney had lost his pocket-book the night he was killed."

The court had prior recited the evidence as follows: "Now, as to the other defendant (Johnson) the State has offered evidence that he was seen talking to Mr. Boney by his son-in-law, Mr. Thompson, at 8:10 that night in his yard; that Mr. Boney was sitting on a rabbit-box and the defendant, Johnson, standing by his side; that he, Thompson, went into the house and that he never saw Mr. Boney any more until he was killed out at the pack-house and found him lying there in the path dead."

The court had prior charged the jury: "As I recall it, that is substantially the testimony in the case. You are not to be governed by my recollection of it, however, but by your own. The counsel have kindly relieved me from the necessity of reading all my notes to you, but suggested that I undertake to summarize it, as I have tried to do. But, if I have left out anything, you will recollect it and consider it with all the evidence, as you recall it."

STATE *v.* MCKINNON.

Defendant Johnson did not request the court below to correct the inadvertence at the time it was made.

The defendant Johnson admitted he was there the "afternoon part or first part of the evening." In a long trial, where there were so many witnesses as in the present case, it is natural that what a witness says may be inaccurately stated from memory. The time Johnson admitted he was there was stated by the court, inadvertently, as the time fixed by Thompson, although Johnson had been there the early part of the evening. This inadvertence should have been called to the attention of the court. To illustrate the wisdom of this, in this case the attorney for defendant McKinnon called attention to an inaccuracy stated by the court in regard to certain testimony in reference to McKinnon. The notes of the evidence were immediately referred to and correction made. The court below warned the jury "not to be governed by my recollection of it however, but by your own." The inadvertence was to a contention. The assignment of error cannot be sustained. *S. v. Geurukus*, 195 N. C., 642.

In the first part of the charge the court below charged the jury: "There arises a presumption of innocence in the defendant's favor, and he ought not to be convicted until all the evidence, fairly considered, satisfied the jury beyond a reasonable doubt of his guilt." And the latter part of the charge: "The law presumes that every defendant when placed on trial on a criminal charge is innocent, and this presumption goes with the defendant through the trial and remains with him until the State has produced evidence which satisfies the jury beyond a reasonable doubt, that he is guilty. If you have a reasonable doubt as to the guilt of either of the defendants, you will acquit that defendant. If you have reasonable doubt as to the guilt of both of them, you will acquit them both. The credibility of the evidence is a matter for the jury to determine under the evidence in the case, what credit or what weight, if any, you will give the evidence of the witnesses. In determining this question, it is your duty to take into consideration the demeanor of the witness on the stand. It is proper for you to take into consideration in passing upon the credibility of any witness, the offenses which he admits he had been guilty of, and you have a right to take into consideration all he says, in order to enable you to determine what weight you give the testimony."

The court below charged the jury: "If the evidence satisfies you beyond a reasonable doubt that both defendants were present at the time the fatal blows were struck and that they were struck for the purpose entertained by both defendants of robbing the deceased, and in attempting to perpetrate such robbery, one of the defendants struck the blows that caused the death of the deceased and that at that time the other de-

fendant was present, to the knowledge of the defendant who struck the blows, for the purpose of encouraging or aiding and abetting in the commission of the robbery, then both defendants would be guilty of murder in the first degree. A person aids when, being present at the time and place, he does some act to render aid to the actual perpetration of the crime, though he takes no direct share in its commission. An abetter is one who gives aid and counsel, or who either commands, advises, instigates or encourages another to commit a crime—a person, who by being present, by words or conduct, incites another to commit the criminal act, or one who so far participates in the commission of the offense as to be present to the knowledge of the person actually committing the crime for the purpose of assisting, if necessary." We think there was sufficient evidence as to aiding and abetting, and the charge fully borne out by authorities. *S. v. Baldwin,* 193 N. C., 566; *S. v. Lambert,* 196 N. C., 524.

The court below charged fully the law of murder in the first and second degrees and manslaughter, and every phase of the law bearing on the evidence.

From a careful review of the evidence, we think it was sufficient to be submitted to the jury as to both defendants—the probative force was for them. We can find no error in law.

No error.