## STATE v. LONNIE PARKER.

(Filed 30 April, 1930.)

**1. Trial E g—Charge correct when construed as a whole will not be held for reversible error.**

The charge of the judge to the jury will be considered as a whole in the same connected way in which it was given, with the presumption that the jury did not overlook any part thereof, and when accordingly it presents the law arising upon the evidence fairly and correctly to the jury, the charge will not be held for reversible error though some of the expressions when standing alone might be regarded as erroneous.

**2. Homicide H c—Instruction in this case held not erroneous.**

Where the evidence upon the trial of a homicide tends to show the defendant guilty of murder in the first or second degree, and the defendant has admitted the killing with a dangerous weapon under circumstances making him guilty of manslaughter at least, a charge of the court to the jury fully defining the three degrees of the homicide and pointing out their constituent elements and distinctive features, and placing upon the State the burden of proving the defendant guilty beyond a reasonable doubt of murder either in the first or second degree, and imposing upon him the burden of satisfying the jury of circumstances sufficient to reduce or mitigate the offense to manslaughter is not erroneous, there being sufficient evidence of the two greater offenses.

**3. Same—Where defendant admits he was aggressor and killed deceased, instruction that he admitted guilt of manslaughter is not error.**

Where the testimony of the prisoner on trial for a homicide is to the effect that he killed the deceased by cutting her throat with a razor after he had provoked her to attack him with a small knife, and that in the fight thus caused he was the aggressor, without evidence on his part of self-defense, the effect of the prisoner's own evidence is to show the offense of manslaughter at least, and the statement in the charge to the jury that prisoner had admitted this degree of the offense is not reversible error.

**4. Homicide E a—Elements necessary to be proven by defendant to show self-defense.**

In order for a prisoner on trial for a homicide to show self-defense, the killing with a deadly weapon being admitted by him, he must show an absence of fault on his part and that the killing was done while he was under actual fear, or had reasonable grounds to fear that his life was in danger or that he was in danger of great bodily harm, and that it was necessary, or that it reasonably appeared to him to be necessary to kill his assailant to save his own life or to protect himself from great bodily harm.

**5. Trial E f—Misstatement of admission of party must be brought to court's attention in apt time or exception will not be considered.**

A misstatement of the admission of a party in the charge to the jury must be brought to the attention of the trial judge in apt time to afford

him an opportunity to correct the same, and an assignment of error based upon an exception thereto is eliminated by the appellant's failure to request a correction or tender a special instruction thereon.

CRIMINAL ACTION tried before *Moore, J.,* at January Term, 1930, of ANSON.

The prisoner was indicted for the murder of his wife, Laura Parker, and was convicted of murder in the first degree. From the sentence of death he appealed, assigning error.

Testifying in his own behalf he gave the following account of the homicide: "I am 20 years old, was born in Union County, and have been living in Anson County twelve years. Have been married about four years. Have no children. Lived on place called Coit Jarman place. Mr. Paul Teal employed me. Tom Tink Leak had charge of the farm. My wife, Laura Parker, and myself lived in a house to ourselves, about 200 yards from where Tom Tink Leak lived. We moved there about a month before crop time. Did not have any trouble when we first moved out there, but about two weeks before her death she had a warrant sworn out for me for hitting her. I was tried before Mr. Gray, and Mr. Waddell paid my fine and costs. I did not go back to live with my wife after the trial, but went to work for Mr. Waddell to work out my fine and costs. Saw Laura in town on Saturday after the trial. We were on friendly terms. Did not see her any more until day she died. I was staying with my mother at night. After seeing Laura in town on Saturday night after the trial I went out in the neighborhood where she was staying, but did not see her. I went to Frank Lomax's house and asked him if he had seen my wife, and if she was at his house. Did not say anything else to him about my wife. On Friday, October 18th, I was at church and saw Laura's brother there. He told me that Tom Tink Leak wanted to see me. On Thursday night I stayed at Ed Horne's house, getting there about ten o'clock. I slept with one of his boys. I had stayed there on Monday night before. Ed lives a little over a mile from where I had lived. On Friday morning Ed told me he would get my wife to pick cotton, and I could talk to her. I told him I did not want to see her. We went to pick cotton, then came back to Ed's and then went to Monroe Leak's to pick cotton. I left Monroe's about eleven o'clock and went over to big road and on down road to my house. I was going to see Tom Tink Leak and find out what he wanted. I went to my house and nobody was there. I had promised my sister who had been washing for me a dress, and I got one of my wife's old dresses out of the house and was going to take it to my sister. Cliff Sullivan lives about two hundred yards from my house. I went on down the road carrying the dress, and went into Cliff's house and got his razor. There was nobody there when I got the razor. I knew where he kept it. I got

the razor so if Tom Tink run on me I would have something. I then went on down the big road, and started to Mr. George Little's quarters, but I turned back and cut through and come back to the road which leads by Tom Tink Leak's house and by my house. After I turned back I tied the dress in front of me like an apron, and as I passed along the road I saw my wife, Laura, and some children in front of the Pearson house. This house sets back from the road. I waved my hand to them, and Laura come across the field and got close to me and stopped and said: 'I didn't know who it was.' We walked on down the road toward the clay hole and talked a good while. I was not mad at her. We was talking about her taking out the warrant for me. After awhile she said she would go back, and she told me she didn't want me any more; that she had another man who would take care of her—she was talking about Tink. She started to leave, and as she did I started to slap her, and we got to scuffling. She had a knife in her hand. In the scuffle we both fell down in the road near the clay hole. In the scuffle my razor fell out of my pocket. She was trying to cut me all the time with her knife. We were both lying on the ground, and I reached around and picked up the razor and cut her. She was cutting at me and I cut her before I knowed what I was doing. I did not mean to kill her. After I cut her I took the knife from her and threw it over in the field on the side of the road. I left her lying on the ground and started off down the road, and I looked back and she was getting up. I saw her fall again, and I went back to where she was and she was dead. I was so scared I hardly knew what I done. I took her and carried her down the road and turned off the road into the field. I don't remember dragging her. I don't remember putting her in a branch nor taking off her clothes nor putting any poles on her. I then went to my mother's house, about five or six miles away. I went past Ed Horne's house, but did not talk to Ed's wife or any other person. Did not tell Mary Fanny Horne that I had on my wife's shoes and that bloodhounds couldn't track me. When I cut her she was still trying to cut me. My thumb was cut while we were in the tussle. Never had talk with Willie McCuller he told about on stand; he was wanting to go with my wife and wanting me to go with his sister. Ed Horne's wife did not go with me, and I did not tell Mr. Tice that I had taken Ed Horne's wife, and I don't remember telling Mr. Tice about cutting my thumb on mowing blade. My wife's hand was cut in the tussle with the razor."

There was evidence tending to show that the deceased had indicted the prisoner for an assault; that for ten days prior to the homicide they had not lived together; that her death occurred on Friday, 18 October, 1929; that on the preceding Monday he had requested one of the witnesses to take her "in the dark somewhere and that would be the end of

her"; that he had said on another occasion that "she didn't treat him right and he was going to fix her"; that he told the wife of one of the witnesses "that he had killed Laura and put her away, and they would never find her," and asked that she would not tell any one she had seen him, because no one had seen him that day except her and Laura; that after arresting the prisoner a deputy sheriff and others examined the premises near the place where the prisoner and his wife had formerly lived; that they found blood in the road near a clay hole a short distance from the home in which the prisoner had lived; that about fifty yards from the clay hole the officer found blood stains on rocks and bushes; that 75 yards away were indications that something had been dragged down the hill from the direction of the clay hole to the woods; that the next morning the naked body of the deceased was found in a pool of water, face down, with logs holding it down so that it was entirely submerged; that her throat was cut and her head almost severed from the body—a hand nearly cut off and four fingers cut across; and that about 30 steps away a woman's clothes covered with trash were found in the hole of a stump.

The prisoner was arrested at his mother's home, seven miles from the place of the homicide.

There was evidence of confessions made by the prisoner. J. F. Tice testified: "He (the prisoner) said that he and his wife got into an argument; that she told him that she did not want to live with him any more, that she had another man who would take care of her. Defendant said that he and his wife got to tussling and they both fell to the ground, and that the razor which he had in his pocket fell to the ground while he was tussling; that his wife tried to cut him with a little knife, tin handle knife, and he picked it up and threw it away and then picked up his razor off the ground and cut her throat; that he then took the knife and threw it in a pasture at the side of the road; that he cut his wife's throat before he realized what he was doing."

Dr. J. M. Covington said: "The defendant told me he had killed his wife, but did not go there for the purpose of killing her; that he went to bring her home, and saw her at a distance and she came to him; that he tried to get her to go home with him and an argument took place; that they got to scuffling and fighting and he cut her throat with the razor."

The assignments of error are set out in the opinion.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Rowland S. Pruette and Barrington T. Hill for prisoner.*

ADAMS, J. The prisoner's assignments of error assail the following parts of his Honor's charge to the jury: 1. "Now, gentlemen, in this

case, as I understand it, and as I understood the admissions of the parties, there are only two questions before you: Whether the defendant is guilty of murder in the first degree or guilty of murder in the second degree; they admit that he would be guilty of manslaughter under the facts proven in this case." 2. . . . and if, according to the admissions, you fail to find him guilty of murder in the first degree, or guilty of murder in the second degree, then you would return a verdict of guilty of manslaughter because that is admitted." 3. "If you fail to find him guilty of murder in the first degree, then you pass to murder in the second degree, and if you find him guilty of murder in the second degree beyond a reasonable doubt it is your duty to say so, and if you fail to find him guilty of murder in the second degree beyond a reasonable doubt, then I instruct you to return a verdict of guilty of manslaughter." 4. . . . "and so that you might know what manslaughter is in passing upon the other degrees, two degrees, I will define it for you. As I charged you, the defendant admits that he is guilty of manslaughter, and perhaps in passing upon that fact you ought to know what manslaughter is to aid you, if it does; so I will give you such information as you may be entitled to as to the other degrees." 5. "Now, the burden is cast on him and he admits he is guilty of manslaughter without offering any defense as to that." 6. "If, however, the deceased assaulted the prisoner, that is, if she laid her hand upon him against his will, or struck or choked him, and the prisoner killed the deceased in the heat of passion and under those circumstances, he would not be guilty of more than the crime of manslaughter, and he admits that." 7. "I have just defined to you so that you might know what manslaughter is, so that it might be some guidance in passing upon the other two degrees of murder that I gave you heretofore, and the instruction as to that remains the same."

These excerpts are not to be treated as instructions detached from and unrelated to other portions of the charge. In *S. v. Exum,* 138 N. C., 599, 619, this Court approved and applied the following quotation from 2 Thompson on Trials: "It (the charge) is to be considered as a whole in the same connected way in which it was given, and upon the presumption that the jury did not overlook any portion of it. If, when so construed, it presents the law fairly and correctly to the jury, it will afford no ground for reversing the judgment, though some of the expressions, when standing alone, might be regarded as erroneous." Thus considered the charge is free from reversible or prejudicial error. The trial judge carefully defined the three degrees of felonious homicide and pointed out respectively their constituent elements and distinctive features. He clearly and repeatedly stated the principle which imposed upon the State the burden of proving beyond a reasonable doubt that the prisoner was guilty of murder in the first or the second degree and which imposed

upon the prisoner, who admitted the killing, the burden of satisfying the jury of circumstances sufficient to reduce or mitigate the offense to manslaughter. In connection with almost every instruction relating to manslaughter he told the jury that as to this offense the prisoner admitted his guilt. This statement is the gravamen of the errors assigned; in fact, it raises the single question which we are called upon to decide.

In considering the exceptions we must bear in mind the important fact that there is no evidence whatever of self-defense. In a prosecution for homicide among the basic elements of self-defense are an absence of fault on the part of the prisoner, actual apprehension and reasonable grounds to apprehend that his life was in danger or that he was in danger of great bodily harm, and that it was necessary or that it reasonably appeared to the prisoner to be necessary to kill the deceased in order to save his own life or to protect himself from bodily harm. *S. v. Crisp,* 170 N. C., 785; *S. v. Baldwin,* 184 N. C., 789; *S. v. Evans,* 194 N. C., 121. None of these elements appears in the evidence; none was testified to by the prisoner.

In the absence of evidence of self-defense, the prisoner, having admitted that he killed his wife, was guilty of murder in the first degree, or murder in the second degree, or manslaughter. The State offered ample evidence to prove murder in the first degree—evidence of express malice, preparation, deliberation and premeditation; and the prisoner's version of the homicide shows him to be guilty, at the least, of manslaughter. He testified that after a conversation between him and his wife she turned to leave him and he struck her; a combat ensued, in which he cut her with the razor and took her life. True, he said she was trying to cut him; but he was the aggressor; he not only entered into the combat willingly; he provoked it. The homicide according to his testimony was certainly nothing less than manslaughter. *S. v. Baldwin,* 152 N. C., 822; *S. v. Kennedy,* 169 N. C., 288; *S. v. Merrick,* 171 N. C., 788; *S. v. Evans,* 177 N. C., 564. The judge could safely have told the jury that the prisoner upon his own testimony was guilty at least of this offense. We do not see how under these conditions the prisoner was prejudiced by the instruction that he admitted he was guilty of manslaughter.

It is manifest, however, that his only hope was to reduce the homicide from murder to manslaughter, and that he did make this admission. Four or five times in charging the jury the judge referred to it. At no time during the progress of the charge or before the verdict was returned did the prisoner's counsel object to the instruction or suggest or intimate that the admission had not been made. In *Barefoot v. Lee,* 168 N. C., 89, the Court remarked in reference to an admission of counsel that if the plaintiffs wished to challenge its correctness they should have called

it to the attention of the court at the proper time, and that it was too late, after verdict, to avail themselves of its incorrectness as a matter of right. The situation is similar to that which arises out of the misstatement of a contention. The trial court is entitled to an opportunity to restate any contention and to correct any erroneous statement of an admission, and failure to request a correction or to give a special instruction on the point eliminates the assignment of error. *S. v. Steele,* 190 N. C., 506, 510. We find

No error.