STATE v. M. A. KING.

(Filed 31 May, 1941.)

**1. Criminal Law § 53e—**

In a prosecution for "hit and run driving," Michie's Code, 2621 (313), an instruction that defendant was charged with the violation of one of the motor vehicle statutes designed for the protection of life and property, cannot be held for error, the statement not being related to any fact in issue or any evidence introduced in the case, and containing no inference as to the guilt or innocence of defendant, it further appearing that the court correctly charged upon the presumption of innocence and the burden of proof.

**2. Criminal Law §§ 32a, 52b—**

In order to sustain a conviction on circumstantial evidence, the evidence must tend to prove the fact of guilt to a moral certainty and exclude any reasonable hypothesis of innocence, but when the evidence reasonably conduces to the conclusion of guilt as a fairly logical and legitimate deduction and not merely such as raises only a conjecture, it is for the jury to say whether the evidence convinces them of defendant's guilt beyond a reasonable doubt.

**3. Automobiles § 28—Circumstantial evidence that defendant was driver of "hit and run" car held sufficient to be submitted to jury.**

All the evidence tended to show that the car of the prosecuting witness was struck by a car which was traveling at the time of the accident with its left wheels over the center line of the highway, that an occupant in the car of the prosecuting witness was injured, and that the car which collided with her car failed to stop after the collision, Michie's Code, 2621 (313). The State's circumstantial evidence, including marks on the highway leading uninterruptedly from the point of collision to a car parked at defendant's place of business, which defendant admitted to be his, the condition of defendant's car, a hub cap and other automobile parts found at the scene of the collision which were missing from defendant's car, and other circumstances tending to show efforts on the part of defendant to conceal the identity of his car as the one involved in the collision, together with testimony by defendant that no one else had driven his car on the evening in question, *is held* sufficient to have been submitted to the jury on the question of defendant's guilt, and his motions for judgment as of nonsuit were properly refused.

**4. Criminal Law § 52a—**

The competency, admissibility and sufficiency of the evidence is for the court; its weight, effect and credibility is for the jury.

**5. Criminal Law § 53g—**

A misstatement of the contentions of the parties in the charge must be brought to the court's attention in apt time.

**6. Same—**

In a prosecution for "hit and run driving" a charge that defendant admitted that there was a collision causing damage to the car of the

prosecuting witness and injury to one or more occupants thereof, and that the other car failed to stop after the collision, if deemed a misstatement of defendant's admissions, should have been called to the court's attention in apt time in order to afford the court an opportunity to make correction.

**7. Criminal Law § 48d—**

During the examination in chief, the court permitted the State's witness to testify over objection as to whether defendant was intoxicated at the time the witness saw him some time after the collision in question. During cross-examination of the witness the court stated that it sustained the objection to the question as to defendant's condition, and directed that the jury not consider it and that it be stricken from the record. *Held:* The court properly corrected its inadvertence in the admission of the testimony and withdrew it from the consideration of the jury.

Appeal by defendant from *Frizzelle, J.,* at February Term, 1941, of Granville. No error.

The bill of indictment on which defendant was tried and convicted is as follows: "The Jurors for the State upon their oath present: That M. A. King, late of the County of Granville, on the 26th day of October, in the year of our Lord, one thousand nine hundred and forty, with force and arms, at and in the County aforesaid, did unlawfully, willfully and feloniously fail to stop his motor vehicle, involved in an accident, at the scene of such accident, and give his name, address, operator's or chauffeur's license number, registration number of his vehicle and render assistance to Mrs. G. G. Ragland, the person injured in said accident against the form of the statute in such case made and provided and against the peace and dignity of the State. Murdock, Solicitor."

Mrs. G. G. Ragland testified, in part, as follows:

"The accident occurred between King's place of business and Oxford, about 250 yards or something, from King's place of business. The accident occurred about 7:00 o'clock in the evening and it was dark. I was traveling (north) in the direction of Oxford. There were four others in the car with me. Mrs. Garland Ragland, Miss Helen Harris, Frances Ragland, my daughter, and Dorothy Ragland, Mrs. Garland Ragland's daughter.

"The accident occurred just before the beginning of a curve. The highway is slightly down-grade in the direction I was traveling. I was driving at about 30 miles an hour on my right-hand side of the highway. The other car involved in the accident with my car was going (south) toward Durham. I was meeting the other car. As I approached the curve I saw the lights of an approaching car coming around the curve. I was unable at that time to tell on what part of the highway the approaching car was being driven. As it straightened out and focused its lights on me I noticed that it was being driven entirely on my side of the highway. I pulled out upon the shoulder and applied my brakes. Just

then the car struck my car. I drove on to the shoulder as far as I could without going down an embankment. My left-hand front wheel and rear wheel were about two feet on the paved portion of the highway. When the collision occurred my car was practically at a standstill. It rolled about a foot more after the collision. The left-hand front fender and wheel and running board of my car were struck. I am unable to say at what speed the car which struck my car was traveling.

"The other car kept going. The car was going very fast, but I would not say how fast. It was going more rapidly than my own car was going. I do not know who was driving the car that collided with my car. I do not know what kind of an automobile it was or what model, nor do I know the color of the car. I did not observe the other car in any way except that it struck my car. The collision knocked up the front left-hand fender of my car and tore it up and ripped up the running board and knocked the hub cap off my front left wheel and burst a hole in the tire and bent the rim. I drove my car into Oxford after the collision, but was unable to make a left-hand turn for the reason that the fender was crushed down so near the wheel. I remained at the scene of the collision about 15 or 20 minutes, and the other car did not come back. I was not injured, but Mrs. Garland Ragland sustained a bruised knee, being thrown from the back seat into the front of the car. My daughter's arm was bruised."

Mrs. G. G. Ragland (recalled), testified further: "(Upon being shown a piece of hub cap): I have seen that before, I first saw it on the highway at the scene of the collision. It was opposite the rear end of my car, probably in the middle of the highway. It has the word 'Chevrolet' on it. It did not come off my automobile. I was driving a 1936 Chevrolet. (Upon being shown two other articles.) I picked up the smaller. piece, the ring. When I saw the other piece, Mr. Carter, the Highway Patrolman, had it. These three parts of an automobile, apparently automobile parts, did not come off the car I was driving."

W. B. Dixon testified, in part: "I saw the car that struck Mrs. Ragland's car just before the collision. My opinion is that the car which struck Mrs. Ragland was traveling at about 40 miles an hour. It did not stop after the collision and kept coming and appeared to pick up speed. The distance between my car and the Ragland car at the time of the collision was something like 100 feet or more. After this car struck Mrs. Ragland's car it seemed to be going toward me, turning further to its left. Just before it got to me, less than one-half the distance across the courtroom, it made a sharp turn back to the right, away from me. I heard the noise made by the collision of the two cars. I was about 100 feet away at the time. I know the defendant, M. A. King, just enough to know him when I see him. I reckon I have known

him for twenty years. I do not know who was driving the car that struck Mrs. Ragland's car, nor do I know the make of automobile it was. Neither do I know the color of the car, except that it was a dark car. It was a closed car. I do not know that I have seen the car involved in the collision with Mrs. Ragland's car since the collision occurred. (Upon being shown hub caps and being asked if he had seen these hub caps before) : They look like the same things that were picked up by Mrs. Ragland at the scene of the accident—two hub caps and a piece. The car that struck Mrs. Ragland's car did not stop. I stopped at the scene of the collision and stayed there for some time."

W. T. Beasley testified, in part : "I have been deputy sheriff for six years. On the night of October 26, 1940, I went out on the Durham road near the defendant, M. A. King's, place of business. I am familiar with the curve in the highway about 250 yards north (in the direction of Oxford) of King's place of business. I went to the curve with Mr. Otis Harrison, Mr. W. C. Carter, Mr. Al Jenkins and Mr. Ragland. The first time I went was between 8 :00 and 8 :30 o'clock. I went back somewhere around 10 or 11 o'clock. I discovered some marks in the highway. These marks were on the left-hand side of the highway (traveling in the direction of Durham) and in the middle of the curve. The curve is about 75 yards long. The marks were in the middle of the curve on the left-hand side of the highway coming toward Durham. They were about 18 inches or 2 feet to the left of the center of the highway (traveling toward Durham). The mark was a white mark on the pavement. I did not see any other marks. I followed this mark back up the road toward Durham to the defendant M. A. King's service station. There I found a wrecked car with the wheel down, a 1939 Chevrolet. The car was sitting on the right side of the defendant's service station. The mark that I had been following led continually and unbrokenly from where I began to follow it in the center of the curve to where I found the car. The mark led to the left front wheel of King's car. There were no marks beyond the left front wheel. The hub cap on the left front wheel was off, and the running board was bent up on the left side. I did not see the left front tire. When I got there, there was a new tire on the left front wheel. We found the owner of the car, the defendant M. A. King. He was in his service station. I had a conversation with him about the car. There was no hub cap on the left front wheel when I saw the car. We called King out, talked to him about the car, about the wreck on it, and he said he wrecked the car over beyond Durham. He said that was not his car there that done that (evidently referring to collision). He said that he had a wreck over toward Durham around 6 o'clock the same night; said he ran into a bridge. He said Mr. Wilbur Whitfield had knocked his hub cap off about a week or two before. He

STATE *v.* KING.

said that he had not had a new hub cap since Mr. Whitfield knocked it off. Q. What was the condition of the defendant at the time you talked to him, Mr. Beasley? (Objection by defendant—overruled—exception, Exception No. 1.) Ans.: He was well under the influence of some intoxicant, Mr. King was. (Motion by defendant to strike—overruled—exception, Exception No. 2.) King said that he had had an accident; ran into a bridge about 6:00 o'clock that night over near Durham. He showed us what damage had been done. He showed us the running board and hub cap and fender on the left side. The left side and fender were bent. He said there had been no hub cap on his left front wheel for a week or two. He said that Mr. Whitfield was going to get him one. He said that the collision with the bridge bent his running board and fender. Q. Did he (King) say whether or not anyone else had been driving his car that night? Ans.: He said that they had not. Q. Had not since 6:30 when he ran into the bridge? Ans.: Yes, sir. (Motion to strike all of witness' testimony—denied—exception—Exception No. 3.) (Cross-examination) Q. At what time did you do the tracking which you have described to the jury, on which of your visits to the scene of the collision? Ans.: Somewhere around 9:30 and 10 o'clock was one time, then we went back again. Q. You stated first that you went out there somewhere between 8:00 and 8:30. You went back again about 10:00? Am I correct about that? Ans.: Yes, sir. (The Court: I sustain your objection to the question and answer as to the condition of the defendant. Do not consider that testimony, gentlemen, strike it from the record.) . . . I talked to Mr. King on the trip I made out to his place about 10 o'clock. It was then that Mr. King told me his hub cap had been knocked off by Wilbur Whitfield. He did not tell me that it had been knocked off by a man named Whitfield. He told me that it was knocked off by Wilbur Whitfield. He did not tell me that he had knocked his hub cap off in a collision with a bridge. He said that the other damage done to his car was done in collision with a bridge."

G. G. Ragland testified, in part: "At that time I had a conversation with him (King). I asked if that was his car, to which he replied 'Yes.' I told him that my car had been wrecked about an hour and a half ago. He said 'This is my car here,' and I said 'I noticed one wrecked.' I did not know it was his car until he told me that it was. The fender was torn up, and running board and the hub cap was knocked off. He said, 'I done that in two wrecks.' He said that he had run into a bridge, tore off his fender and mashed it up, and then later Whitfield backed into him one night, knocking his hub cap off. He said that was the reason that he had no hub cap on his wheel."

Hubert Moore testified, in part: "I work for Blalock Chevrolet Company in Oxford. I have worked with them for about two years. I know

the defendant Mr. M. A. King. I know where his place of business is on the Durham road. I was working on the night of October 26th. I went to Mr. King's place of business that night for the purpose of fixing a tire. It was about 8:30 that I went, I think. I saw Mr. King and I saw his automobile sitting behind his place of business. The right-hand side, that is on the side nearer to Oxford than to Durham. It was about 10 or 15 yards from the building, I reckon. It was at his place of business, by his building and in front of the highway. The front wheel on Mr. King's automobile was bad—the left front wheel it was bent and battered up. There was no tire on the left front wheel. There was no hub cap on the left front wheel." On account of a dispute about the price, he did not put on the new tire.

W. C. Carter testified, in part: "I am a member of the State Highway Patrol. On the night of October 26, 1940, I got a call to an accident on the Durham-Oxford road. I went out to the defendant M. A. King's place of business. I know the defendant and I know where his place of business is. It is about three miles from Oxford. I saw the defendant there. I also saw a 1939 Chevrolet automobile. It was a coach, dark green in color. The car was parked in the yard of the defendant's filling station on the side nearest to Oxford. When I saw it the left-hand front fender was bent up and the hub cap on the left front wheel was gone. The grease cup on the hub was bent up. . . . There was a new tire on the left front wheel. The left front wheel was good. I went there about 10:30. I had a conversation with the defendant King. After looking at the car I called for Mr. King to come out. He came out and I asked him about his fender being bent up. He stated that the fender was bent up some time that afternoon. I said 'Well, have you driven this car since this afternoon?' He first said, 'This car has been parked here ever since 4:30.' Then in a few minutes in talking to him he said the car was parked there about 6:30. I asked him about the fender being bent up. He told me that a part of that was done on a bridge over Tar River between there and Franklinton. . . . I first asked him about the rim and wheel he did not tell me immediately that it was in the back of the car. I told him, 'I have got to see this rim.' He said, 'All right, it is there in the back, go look at it.' I went and looked at it. I asked him where the tire was. He did not tell me where the tire was. He never told me where the tire was. There was no tire on that rim. He did not say where he got the rim or whether that was on the left front of his car when I saw it. He did not say whether or not it was a spare. . . . The marks that I saw on the highway were some 25 or 30 feet in rear of where the defendant's car was sitting, and these marks led in the direction of Oxford about 250 yards. I did not see any marks on the dirt. The mark that I saw led from the right-hand edge of the concrete

(going in the direction of Durham), then back to the center and then toward Oxford. The marks that I have described left the paved highway, going in the direction of where the defendant's car was parked. I am familiar with the curve in the highway about 250 yards (north) of the defendant's service station. The marks that I have described led from the front of the defendant's service station along the highway (north) to a point in the highway just beyond which the curve to the left began. Mr. Ragland was with me all of the time that night. Mr. Ragland told me that the wreck occurred near the curve just described. He undertook to point out the place of the collision from what his wife had told him. There was dirt at the point on the paved portion of the highway. The track that I have described ended where this dirt was on the left-hand side of the highway coming toward Durham."

The defendant introduced no evidence. The jury returned a verdict of guilty. The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be considered in the opinion.

*Attorney-General McMullan and Assistant Attorneys-General Bruton and Patton for the State.*

*B. S. Royster, Jr., for defendant.*

CLARKSON, J. At the close of the State's evidence the defendant made a motion in the court below for judgment as of nonsuit. C. S., 4643. The court below overruled this motion and in this we can see no error.

The defendant was indicted under N. C. Code, 1939 (Michie), sec. 2621 (313)—Duty to stop in event of accident: "(a) The driver of any vehicle involved in an accident resulting in injury or death to any person shall immediately stop such vehicle at the scene of such accident, and any person violating this provision shall upon conviction be punished as provided in section 2621 (327). (b) The driver of any vehicle involved in an accident resulting in damage to property and in which there is not involved injury or death to any person, shall immediately stop such vehicle at the scene of the accident, and any person violating this provision shall be guilty of a misdemeanor and fined or imprisoned, or both, in the discretion of the court. (c) The driver of any vehicle involved in any accident resulting in injury or death to any person or damage to property shall also give his name, address, operator's or chauffeur's license number and the registration number of his vehicle to the person struck or the driver or occupants of any vehicle collided with, and shall render to any person injured in such accident reasonable assistance, including the carrying of such person to a physician or surgeon for medical or surgical treatment if it is apparent that such treatment is

22—219

necessary or is requested by the injured person, and it shall be unlawful for any person to violate this provision, and shall be punishable as provided in section 2621 (327)."

Section 2621 (327) penalty for failure to stop in event of accident involving injury or death to a person.

All the evidence is to the effect that the party driving an automobile was on the wrong side of the road, when it struck the automobile driven by Mrs. G. G. Ragland and did not stop. Was the evidence, circumstantial in its nature, sufficient to have been submitted to the jury that defendant King was the party driving the automobile? We think so.

The court below in beginning its charge said: "The defendant, M. A. King, is being tried under a bill of indictment which charges on the 26th day of October, 1940, the defendant did unlawfully, wilfully and feloniously fail to stop his motor vehicle involved in accident, at the scene of such accident, give his name, address, and motor or chauffeur's license, and registration number of his vehicle, render assistance to Mrs. S. G. Ragland, the person injured in such accident. The bill of indictment is laid upon a specific statute, one of a large number of motor vehicular laws, enacted by the General Assembly of North Carolina, designed to protect life, limb and property upon the streets and highways of this State."

The defendant contends: "That the language 'designed to protect life, limb and property upon the streets and highways of this State' was calculated, though not intended, to prejudice the jury. The court has held that the trial judge ought to be careful at all times not to make any remark or comment during the progress of a trial, nor in his charge to the jury, which might prejudice the jury against the defendant."

This statement is not related to any fact in issue or any evidence introduced in the case. The judge has voiced no opinion as to the guilt or innocence of the defendant. He has merely explained the purpose of the law.

The court then read the statute above set forth under which defendant was indicted. Taking this part of the charge as a whole, we can see no error either prejudicial or otherwise. The court goes on and charges the jury in accordance with the statutory law applicable, to which no exception is taken.

The court below in its charge, which is correct and to which no exception was taken, said: "The burden is upon the State to satisfy the jury upon the evidence in this case beyond a reasonable doubt of the defendant's guilt. The defendant is presumed to be innocent, and that presumption of innocence remains with him throughout the trial and would entitle him to a verdict of not guilty unless or until the State overcomes that presumption of innocence cast about him by the law and establishes

in the minds of the jury the guilt of the defendant beyond a reasonable doubt. A reasonable doubt is not an imaginary, capricious, or possible doubt nor one born of sympathy for the defendant or those interested in or dependent upon him, nor of a humanitarian desire or inclination on the part of the jury to shield or protect a defendant against the consequence of an unlawful act, but it is a fair doubt, a reasonable doubt, based upon reason and common sense, legitimately warranted by and arising out of the testimony in the case."

In *S. v. Newton,* 207 N. C., 323 (327), it is written: "Circumstantial evidence is not only recognized and accepted instrumentality in ascertainment of truth, but in many cases is quite essential to its establishment. In cases where State relies upon circumstantial evidence for conviction, circumstances and evidence must be such as to produce in minds of jurors moral certainty of defendant's guilt and to exclude any other reasonable hypothesis, but evidence should be submitted to them if there is any evidence tending to prove fact in issue, or which reasonably conduces to its conclusion as fairly logical and legitimate deduction, and not merely such as raises only suspicion or conjecture, and it is for the jury to say whether they are convinced from evidence of defendant's guilt beyond reasonable doubt. *S. v. McLeod,* 198 N. C., 649." *S. v. Stiwinter,* 211 N. C., 278 (279).

The State's evidence was to the effect that defendant King had a place of business on the road leading from Oxford to Durham, it was about two and a half miles on the Durham road. Mrs. G. G. Ragland, on 26 October, 1940, about dark, was traveling north towards Oxford when the accident occurred between King's place of business and Oxford, at 7:00 o'clock in the evening. The accident was about 250 yards from King's place of business, it occurred just before the beginning of a curve in the highway slightly down grade in the direction she was traveling. She was traveling about 30 miles an hour on the right-hand side of the highway. The car that struck her car was going south towards Durham. As she approached the curve a car was coming meeting her car, lights burning, and as it straightened out and focused its lights she noticed that it was being driven entirely on her side of the highway. She pulled out on the shoulder and applied the brakes; when the car struck her car her left-hand front wheel and rear wheel were about two feet on the paved highway and her car was practically at a standstill. The left-hand front fender, wheel and running board were struck by the other car—which kept going.

Evidence of identity of the car: (1) a hub cap was picked up at the place of the collision. "It was opposite the rear end of my car, probably in the middle of the highway. It has the word 'Chevrolet' on it. It did not come off my automobile. I was driving a 1936 Chevrolet. (Upon

being shown the other two articles) I picked up the smaller piece, the ring. When I saw the other piece, Mr. Carter, the Highway Patrolman, had it.—These three parts of an automobile, apparently automobile parts, did not come off the car I was driving."

(2) A mechanic of the Blalock Chevrolet Company, in Oxford, was sent out to the defendant's place of business at the request of defendant King, for the purpose of fixing a tire. This was about 8:30 o'clock on 26 October, 1940, the night of the accident. King and his automobile were both there. "It was at his place of business, by his building and in front of the highway. The front wheel on Mr. King's automobile was bad—the left front wheel it was bent and battered up. There was no tire on the left front wheel. There was no hub cap on the left front wheel. I started to change the tire, but I did not finish the job. I was going to put on a new tire. I had carried one with me." On account of a dispute about the price, the mechanic did not put on the new tire.

(3) The Highway Patrolman Carter got a call, notifying him of the accident, and went to King's place of business about 10:30. He knew defendant and the place of business. He testified, in part: "I had a conversation with the defendant King. After looking at the car I called for Mr. King to come out. He came out and I asked him about his fender being bent up. He stated that the fender was bent up some time that afternoon. I said, 'Well, have you driven this car since this afternoon?' He first said 'This car has been parked here ever since 4:30.' Then in a few minutes in talking to him he said the car was parked there about 6:30. I asked him about the fender being bent up. He told me that a part of that was done on a bridge over Tar River between there and Franklinton. . . . When I first asked him about the rim and wheel he did not tell me immediately that it was in the back of the car. I told him, 'I have got to see this rim.' He said 'All right, it is there in the back, go look at it.' I went and looked at it. I asked him where the tire was. He did not tell me where the tire was. He never told me where the tire was. There was no tire on that rim. He did not say where he got the rim or whether that was on the left front of his car when I saw it. He did not say whether or not it was a spare." In the interim before 8:30 o'clock it will be noted that defendant got someone else than the mechanic to put the new tire on. There was other corroborating evidence that the car, after the accident, traveled from about the place of the accident to the wrecked Chevrolet at King's place of business, admitted by King to be his car.

(4) The Patrolman Carter testified: "I saw the defendant there. I also saw a 1939 Chevrolet automobile. It was a coach, dark green in color. The car was parked in the yard of the defendant's filling station on the side nearest Oxford. When I saw it the left-hand front fender

was bent up and the hub cap on the left front wheel was gone. The grease cup on the hub was bent up. . . . There was a new tire on the left front wheel."

The identity of defendant as being the man who was driving the car: The accident occurred about 7:00 o'clock. The Patrolman Carter testified: "I said, 'Well, have you driven this car since this afternoon?' He first said, 'This car has been parked here ever since 4:30.' Then in a few minutes in talking to him he said the car was parked there about 6:30. . . . I told him that the fender had been bent up." The Deputy Sheriff Beasley testified: "Q. Did he (King) say whether or not anyone else had been driving his car that night? Ans.: He said that they had not. Q. Had not since 6:30 when he ran into the bridge? Ans.: Yes, sir." The evidence of changing the tire to conceal his identity and other circumstances.

Taking all the evidence, it was of sufficient probative force to be left to the jury to determine, it was more than a scintilla. The competency, admissibility and sufficiency of evidence is for the court; the weight, effect and credibility is for the jury.

The defendant contends that the portion of the charge in which the judge said that the State contended that both officers and private citizens found markings in the highway continuing in an unbroken sequence from the place of the accident to the defendant's car, was in error. Under the decisions of this Court, the defendant waived any objection he might have had to the manner in which this contention was stated by failing to complain to the judge before the case was submitted to the jury. *S. v. Baldwin*, 184 N. C., 789; *S. v. Johnson*, 207 N. C., 273; *S. v. Bowser*, 214 N. C., 249. The testimony of Beasley and others bore out the contentions of the court below.

The court below charged the jury: "The defendant admits that there is no controversy as far as he is concerned about the fact there was a wreck or collision at the time and place alleged and contended by the State; that there is no controversy about the fact that the damage in that collision resulted to the car and to the person of one or more of the occupants of the car and that the operator of the car involved in that collision drove away without complying with the mandates of the statute which has been read in your presence." All of the evidence bears out the correctness of the charge.

This Court has held that a misstatement of an admission by a party does not constitute error unless it is called to the attention of the court at the time in order that there may be a correction. *S. v. McKinnon*, 197 N. C., 576; *S. v. Parker*, 198 N. C., 629; *S. v. Sloan*, 199 N. C., 598; see *S. v. Redman*, 217 N. C., 483 (485).

In *S. v. Parker, supra*, no error was found in a statement that the

defendant had admitted that he was guilty of manslaughter, although the statement was inaccurate. *Justice Adams* said, at p. 634: "At no time during the progress of the charge did the prisoner's counsel object to the instruction or suggestion or intimation that the admission had not been made. In *Barefoot v. Lee,* 168 N. C., 89, the Court remarked in reference to an admission of counsel that if the plaintiffs wished to challenge its correctness they should have called it to the attention of the court at the proper time, and that it was too late, after verdict, to avail themselves of its incorrectness as a matter of right. The situation is similar to that which arises out of the misstatement of a contention. The trial court is entitled to an opportunity to restate any contention and to correct any erroneous statement of an admission, and failure to request a correction or to give a special instruction on the point eliminates the assignment of error. *S. v. Steele,* 190 N. C., 506 (518)."

In the testimony of W. T. Beasley is the following: "Q. What was the condition of the defendant at the time you talked to him, Mr. Beasley? Ans.: He was well under the influence of some intoxicant, Mr. King was. (Exception by defendant. Exception overruled.) King said that he had had an accident; ran into a bridge about 6 o'clock that night over near Durham. He showed us what damage had been done. He showed us the running board and hub cap and fender on the left side. The left side and fender were bent. He said there had been no hub cap on his left front wheel for a week or two. He said that Mr. Whitfield was going to get him one. He said that the collision with the bridge bent his running board and fender. Q. Did he (King) say whether or not anyone else had been driving his car that night? Ans.: He said that they had not. Q. Had not since 6:30 when he ran into the bridge? Ans.: Yes, sir. (Cross-examination) Q. What time did you do the tracking, which you have described to the jury, on which of your visits to the scene of the collision? Ans.: Somewhere around 9:30 and 10:00 o'clock was one time, then we went back again. Q. You stated first that you went out there somewhere between 8:00 and 8:30. You went back again about 10:00? Am I correct about that? Ans.: Yes, sir." When the witness was being cross-examined, the court said: "I sustain your objection to the question and answer as to the condition of the defendant. Do not consider that testimony, gentlemen, strike it from the record."

In *S. v. Stewart,* 189 N. C., 340 (345), *Adams, J.,* citing a wealth of authorities, said: "In *McAllister v. McAllister,* 34 N. C., 184, *Ruffin, C. J.,* said: 'It is undoubtedly proper and in the power of the court to correct a slip by withdrawing improper evidence from the consideration of the jury, or by giving such explanations of an error as will prevent it from misleading a jury.' He expressed the same opinion more than three-quarters of a century ago and the practice has been observed since that time."

There are other exceptions and assignments of error made by defendant. We have examined them with care and see no merit in them. On the whole record, we find

No error.