### STATE v. NEALIE BROWN.

(Filed 22 March, 1933.)

1. **Homicide G a—Evidence of defendant's guilt of homicide pursuant to conspiracy held sufficient to be submitted to the jury.**

   The direct and circumstantial evidence in this case tended to show that defendant had quarreled with deceased and had entered into a conspiracy to kill him, that deceased was murdered and that all the conspirators, including the appealing defendant, were present, aiding and abetting in the commission of the crime: *Held,* the evidence was sufficient to be submitted to the jury and the appealing defendant's exception to the refusal of her motion as of nonsuit cannot be sustained. C. S., 4643.

STATE *v.* BROWN.

2. **Conspiracy B b—**

   The manner and time in which the evidence is introduced to prove a conspiracy is in the sound discretion of the trial court.

3. **Criminal Law G k—**

   Where testimony as to acts and declarations of one conspirator in the absence of the other conspirators is properly restricted to the issue of his guilt, the exception of the other conspirators to the admission of the evidence cannot be sustained.

4. **Criminal Law G i—Opinion evidence that parties to conversation were mad held competent.**

   In a prosecution for homicide, testimony of a witness from his observation of the defendant and deceased while they were conversing that "they were mad" is held competent.

5. **Criminal Law I i—**

   Conflicting evidence is for the determination of the jury.

6. **Criminal Law L e—**

   Exclusion of evidence relative to defendant's kinship to deceased and of deceased's financial condition as tending to support theory of suicide is held not prejudicial on the whole record in this prosecution for homicide.

7. **Criminal Law—L d—**

   A broadside exception to the charge as given will not be considered.

8. **Homicide H e—Acceptance of verdict of "guilty of manslaughter" after poll of jury held not prejudicial under facts of this case.**

   Where upon the return of the jury in a prosecution for homicide one of the jurors answers "guilty of murder in the third degree," and, upon the jury being polled gives the same answer, but later explains that he intended to say "guilty of manslaughter," and all the other jurors properly return a verdict of "guilty of manslaughter" both in their general verdict and upon being polled: *Held*, an exception to the court's acceptance of the verdict of "guilty of manslaughter" will not be sustained, the record failing to disclose any prejudicial or reversible error.

9. **Criminal Law L d—**

   Under the facts and circumstances of this case the trial court's finding upon the order of the Supreme Court for a correction of the minutes, that the record as formerly certified spoke the truth as the records then existed, *is held* within his discretion.

APPEAL by defendant from *Cranmer, J.,* and a jury, at July Criminal Term, 1932, of DUPLIN. No error.

The defendant, with Hubert Lanier and Adolph Edwards, was indicted for the murder of Ambrose Lanier. The evidence was to the effect that Ambrose Lanier kept a store on the road from Chinquapin to Onslow County, N. C. He was a widower, 54 years old, and lived and slept in the store. On Monday morning, 16 November, 1931, about sunrise he was found dead in the center of the store, his head was lying

south, and was on the left side on his arm, kind of face down, his rifle was on the pool table and an automatic pistol was lying beside him. He was shot in his left temple and through his right arm, the other shot was in his left arm. The pistol lying by his side was just a few inches from his body, where his right hand was lying, like it had been dropped there. There was a sack of change, six or eight dollars, near his hip, with a little blood on it. There was an empty cartridge and a loaded one beside the pistol, there was an empty cartridge jammed in the barrel. There were three in the magazine of the pistol. The cartridges there were by the pistol and were the same that were in the chamber. They were forty-five, steel jacket bullets. There was a .38 rifle lying across the pool table unloaded, and the cartridges lying on the table. The bullet which hit him in the head could not have been fired from the window, but the bullet which hit him in the arm could have been fired from the window. The bullet went through his head almost perfectly level.

J. H. Crumpler, testified, in part: "I live in Clinton and am engaged in the furniture business and am an undertaker. I was called to prepare Mr. Ambrose Lanier's body for burial Monday, 16 November (1931), I had two or three local people to assist me. Tom Griffin was one of them. Sometime during the process of embalming I found this pistol bullet, or one like it, as it fell on the embalming board. It fell from his body somewhere."

Dr. R. C. Williams testified, in part: "There was a difference in the size of the wound in his head and the one in his arm, the one in his head was larger. . . . The wound in the arm was made by a .32 calibre bullet—no burns on the head or on the arm. . . . His death was caused by the bullet wound through his head."

R. C. Seawell testified, in part: "There was a bullet hole in the wall. In looking through the window to the bullet hole in the side you could see the box that the ball struck and went through the wall. . . . A shot could have been fired from the window to that bullet hole in the box." The .32 calibre Smith and Wesson pistol belonged to Davis Batchelor.

Norman Edwards testified, in part: "I am 17 years old. I am a first cousin to Adolph Edwards (defendant). I lived about a mile from Adolph, about two and a half miles from the store of Ambrose Lanier, to the north. Adolph lives northwest from the store. I know Hubert Lanier and Nealie Brown (defendants). I saw them on Friday before Ambrose Lanier was killed on Sunday night. I went down to Rafe Lanier's just across the road from Ambrose Lanier's store. I carried some corn there to be ground and got to the mill about the middle of the day. I carried a bushel of corn in an automobile and when I got

there I saw Hubert and Adolph and they said 'Let's walk about.' We walked down to Nealie Brown's house, about 100 yards from the mill. I saw Nealie Brown at her house. They said 'Let's go to ride,' and we all went to ride, we got in Nealie's automobile, Adolph and Hubert, and I stood on the running board, Nealie was sitting under the steering gear and Hubert was in the front seat and Adolph in the rear. She drove down to Muddy Creek Church, about 150 yards from her house in a westward direction. When we got down to the church Nealie said she was going to kill Ambrose Lanier and she had two pistols lying in the front seat, said she was going to kill him Saturday night. Adolph was sitting on the back seat. Hubert was on the front seat and I was standing on the ground, and they asked me if I would help. She said if I would help kill him, she would assure me of a hundred dollars in money and I said, I don't have anything against him and I was not going to help do it. Hubert said he would measure the windows and see if she could shoot him from the window. He said he would measure it to her height and see if she could shoot him from the rear window. He left and came back in fifteen minutes and he said that her height would be about this high above the window. She measured herself to him and she struck him about this high, and walked up side of one another and measured. Hubert said he would be at Lanier's store and she was to go after Adolph and they had two pistols and one of them was Ambrose Lanier's. Nealie said it was Ambrose Lanier's. I have seen it before, it was a big black automatic. The other one was a .32. Hubert said it was Davis Batchelor's. Nealie said she would kill him from the back window with the small calibre pistol so it would not make so much noise, and she took Davis' pistol and Hubert took Ambrose's. We rode on the automobile to her house and I went back to the mill. That was on Friday about the middle of the day. Hubert took Lanier's pistol from Nealie. This is Ambrose Lanier's pistol. The pistol that they called Davis' was loose. This looks just like it. After I came back to her house, I came back to the mill and went home, that was Friday. I saw them again on Saturday at a corn shucking at Uncle Joe Edwards', this was about four o'clock. I do not know what time the corn shucking broke up, I got in a fight and left about five o'clock. Adolph and Hubert were there. I don't know when they left, this was Saturday night. . . . Ambrose Lanier was in the store when I was talking to him about sunset. It was the last time I saw him alive. . . . We drove by Ambrose's and stopped and Hubert was the first man we saw. Elmer asked 'What was the matter?' and Hubert said 'Uncle Ambrose killed himself last night.' After he told us that, we stayed until the inquest was over. Then Hubert got up in the truck with us and went to Dails to carry the tobacco. He said 'I will tell you all something if you won't

STATE *v.* BROWN.

tell it.' Q. Did you hear them make any statement at Ray Batchelor's? (Objection and exception as to Nealie Brown.) Q. Who was present? A. Hubert and Adolph, and Hubert said 'Adolph, you be ready, you know what time,' and he got out and went in Ray Batchelor's house. Q. Did Adolph go with you anywhere then? A. He brought me home. Q. What did you tell him, if anything? A. I asked him to stay with me that night. I told him if he would stay with me, he would stay out of trouble, and he said he would have to go home, that his mother would be uneasy about him. (Defendants objected and excepted.) Court: It is only evidence against the one speaking at the time and not evidence as against Lanier and the female defendant Brown. Elmer Brown was with us, Hubert said he went to Nealie's one morning that week and was sitting with his arm around her and his Uncle Ambrose walked in and asked Nealie for his hand-saw and stick-broom, and she got it and said that Ambrose told him, Hubert, never to come in his store any more. (The defendants object on the ground that Mr. Lanier is dead and cannot be cross-examined.) Court: It is only competent as against Hubert Lanier. (The defendant and each of them except.) Q. What did Hubert say happened there? A. He told Ambrose that he would go in the store if he had to kill him to get in. (The court instructed the jury that the evidence could only be considered against the defendant Hubert Lanier.) The defendants and each of them objected and excepted to each and every question in regard to the conversation between the dead man and Hubert Lanier.) We brought him back to the store that morning and put him out. I saw Hubert again and had a conversation with him about Ambrose being killed. One night we were 'possum hunting, me and Henry Byrd and Hubert and Adolph and Clarence Byrd. We went down Lindy Swamp. I went with Hubert Lanier to carry his mule and when we got to Hubert's stockade, I asked him how they got along that night. I asked him how they got along with the killing. He said that 'Nealie went around the back window and got on the fish box and shot him, he was sitting on the edge of that pool table and said when she shot at him it hit him in the left arm.' And he said 'Lord, have mercy, she shot me.' And he said he was standing near the window and Adolph was standing on the porch and he said Ambrose fell towards him and he shot him in the head, said he was standing against the counter when he shot him. He said they went there that night about 12 or 12:30. He said that afterwards, Adolph and him went behind Muddy Creek Church and stayed and came back to the store and then Adolph stood on the porch and Nealie went around to his pocket and got some money, $542. That she put the money in her pocket, placed the pistol in his hand, moved the pool table. That he jumped up when she shot him and when he fell they moved the box to one side. When

she ran her hand in his pocket she got blood on the sleeve of her dress and when they got away from the store she put on another dress and burned that one. After she burned the dress she came on by Hubert Jackson's and brought Adolph into Muddy Creek. This was a conversation that I had with Hubert that night. I got up with Adolph and asked him about it. I was going with him one night, walking between Bill Guy's and T. R. Quinn's store and I asked him how he got along with the killing, and asked did he help do it and he said, he reckon so. I told him that I asked Hubert about it and he said I reckon he is about right. . . . Nealie said that they would kill him Saturday night if they could make the plans right. Hubert told me afterwards that everybody was there and they stayed up so late that they just didn't have time, that they could not get it right to kill him on Saturday night. (The defendant objected and excepted.)"

As to the foregoing evidence, the court said: "I instruct you that any statement made by one defendant in the absence of the other one or the other two is only evidence against the person making the statement and you will not consider it as evidence against the others."

Beatrice Mobley testified, in part: "I know Nealie Brown when I see her and had a conversation with her before Mr. Ambrose Lanier was found dead in his store. I do not know exactly when it was, but it was when we were housing tobacco. She told me that Ambrose was jealous of her and her fellows and before she would allow that she said 'I will kill him,' and she said to me 'You don't think I have got the nerve do you,' and I said, 'I don't know.' She said that he was the cause of Archie Brown leaving her and said that he was going to have her to feed."

Elmore Bell testified, in part: "I passed by Ambrose Lanier's store on Sunday night before he was found dead Monday morning. It was sometime between 11:30 and 12 o'clock. Roscoe Jones was with me. I know Nealie Brown's automobile when I see it and I saw her automobile that night setting in Nealie's yard. And I called attention of Roscoe Jones about it. The automobile was setting about six feet off from the porch of Nealie Brown's house."

Dorothy Lanier testified, in part: "I live close to Ambrose Lanier's store and I saw Nealie Brown at the store on Thursday of the week before he was killed. I heard a conversation between her and Ambrose Lanier, they were fussing. I could not understand what they were saying. . . . Q. Did you hear any word that one said to the other? (The defendants objected and excepted.) A. I don't remember what they said but I know that they were mad."

Joe Mobley testified, in part: "I know Ambrose Lanier and Nealie Brown. I was down there on Thursday before he was found dead on

Monday. Nealie Brown was there in the store and I was on the front porch. They were quarreling with one another about something."

There was other circumstantial evidence as to the defendant having killed Ambrose Lanier.

The defendants' evidence was to the effect that they were not guilty. That they accounted in a rational way for all of their acts and doings on the night of the death of Ambrose Lanier, and that neither of them, were present at the death of Lanier, and know nothing about it. They further denied the material part of the testimony of Norman Edwards.

The jury returns to the court room and when asked by the clerk, if they had arrived at a verdict, one juror answered, we find all guilty of manslaughter, another answers guilty of third degree murder. Attorney for defendants asked that the jury be polled, each juror asked as to each of defendants, R. J. Alphin being the first juror polled answered third degree murder. Attorney for the defendant requested that the record speak what they say. *The juror, Mr. Alphin, said he intended to say manslaughter. All the jurors then polled as to each defendant and all answered guilty of manslaughter.*

To the foregoing verdict, the defendants in apt time objected and excepted. A motion was made in this court for an order correcting the minutes. The return to this court, after setting forth certain facts, was as follows: "The court further finds as a fact, that the record heretofore sent to the Supreme Court by the clerk of this court spoke the truth as the records then existed."

The defendant duly made exceptions and assignments of error to the above objections and exceptions and other exceptions and assignments of error and appealed to the Supreme Court.

*Attorney-General Brummitt and Assistant Attorneys-General Seawell and Siler for the State.*

*J. T. Gresham, Jr., for defendant.*

CLARKSON, J. The defendant, Nealie Brown, together with Hubert Lanier and Adolph Edwards, before his Honor, Judge E. H. Cranmer and a jury, at July Term, 1932, Duplin Superior Court, were jointly tried upon a bill of indictment charging them with the murder of Ambrose Lanier. Each of the three defendants were convicted of the crime of manslaughter and from the judgment of the court, Nealie Brown alone appeals.

At the close of the State's evidence and at the close of all the evidence the defendant Nealie Brown made motions to dismiss the action or for judgment of nonsuit. C. S., 4643. The court below overruled these motions and in this we see no error.

We have set forth some of the evidence on the part of the State. It was direct and circumstantial, sufficient to have been submitted to the jury, as to all the defendants, the probative force was for them. The evidence was to the effect that the defendants entered into a conspiracy to kill Ambrose Lanier and pursuant to said purpose were present, aiding and abetting in the crime.

The manner and time in which the evidence is introduced to prove a conspiracy is in the sound discretion of the court below.

In *S. v. Boswell,* 194 N. C., at p. 264-5, citing numerous authorities, it is held: "It is thoroughly established law in this State that the declaration of one conspirator continues, even though made in the absence of the other conspirator. Usually the conspiracy must first be established before such evidence is competent, 'but this rule is often parted from, though it is an inversion of the order, for the sake of convenience, and the prosecution allowed either to prove the conspiracy, which makes the acts of the conspirators admissible in evidence against each other when done in furtherance of the common object, or he may prove the acts of different persons, and thus prove the conspiracy." N. C. Handbook of Evidence, 2d ed. (Lockhart), p. 185, sec. 152.

The testimony of Norman Edwards was restricted by the court below as against the party defendant with whom the alleged conversation took place. We think none of these exceptions, to which assignments of error were made by defendants, can be sustained, they were limited in their scope. The answer "I know that they were mad," was competent. In *Moore v. Ins. Co.,* 192 N. C., at p. 582, we find: "A witness may say that a man appeared intoxicated, or angry or pleased. *Bane v. R. R.,* 171 N. C., 328; *S. v. Leak,* 156 N. C., 643; McKelvey on Evidence, p. 220 *et seq.* Manifestly upon this principle, a witness may say that a man appeared sane and sober."

The defendant went to the stand and denied the material evidence introduced by the State. The conflict of evidence was a fact for the jury to determine. We think none of the exceptions and assignments of error made on the trial as to the admission or exclusion of evidence can be sustained. We do not think the exclusion of evidence as to defendant's kinship to deceased, nor his financial condition to support suicide theory on the whole record, prejudicial.

We find in the record no specific exceptions and assignments of error to the charge. The record discloses the following exception and assignment of error, which cannot be sustained: "To the charge of the court in its entirety, the defendant in apt time objected on the grounds that the judge in his charge did not declare and explain the law arising upon the evidence given in the case, and did not state in a plain and correct manner the evidence in the case."

In *Rawls v. Lupton,* 193 N. C., at p. 430, citing a wealth of authorities, we said: "Errors must be specifically assigned. An 'unpointed, broadside' exception to the 'charge as given,' will not be considered. *McKinnon v. Morrison,* 104 N. C., 354. Exception to the charge of the court in general terms, not sufficiently specific to call the attention of the court to the particular point claimed to be erroneous, cannot be considered by an appellate court."

We do not think the charge impinged on C. S., 564. The exception and assignment of error as to "alibi" cannot be sustained. This matter is fully discussed in *S. v. Casey,* 201 N. C., at p. 209.

As to the verdict of the jury on the trial, the record discloses: "The jury returned to the court room and when asked by the clerk, if they had arrived at a verdict, one juror answered, we find them all guilty of manslaughter, another answered guilty of third degree murder. Attorney for defendants asked that jury be polled, each juror asked as to each of the defendants, R. J. Alphin being the first juror polled answered third degree murder. Attorney for the defendant requested that the record speak what they say. The juror, Mr. Alphin, said he intended to say manslaughter. All the jurors then polled as to each defendant and all answered guilty of manslaughter. To the foregoing verdict, the defendants in apt time, objected and excepted."

In the order correcting the minutes, it appears that there were no minutes to be corrected. "The court further finds as a fact, that the record heretofore sent to the Supreme Court by the clerk of this court, spoke the truth as the records then existed."

The record discloses that on the trial of defendant the jury as polled answered "guilty of manslaughter." We see no prejudicial or reversible error. The juror no doubt was thinking of murder in the first degree, murder in the second degree and manslaughter was third degree. The juror said he intended to say manslaughter. The court below had, under the facts and circumstances of this case, discretion to do what was done to make the record speak the truth and have it so recorded. The cases cited by the defendant are not applicable to the facts of record.

The learned and painstaking judge in the court below, in a long charge, gave all the contentions on both sides fairly, set forth the law carefully, applicable to the facts. We find no prejudicial or reversible error.

No error.