The defendant was tried at the February Term, 1940, of Sampson Superior Court upon a charge of murder, was convicted of murder in the first degree, and sentenced to death.
The evidence tended to show that William Daniel, a man of about sixty years of age, living alone on a small farm in Sampson County, was found dead near a path leading from his home through the field and into the woods. His skull had been fractured and there were several lacerations about the face and head. Death was attributed to a fracture of the skull. A brick and bloody cherry limb were found near the body.
On the next day the defendant, who lived near Daniel's home, was arrested for the murder. The evidence tends to show that prior to the time he was arrested the defendant went to his aunt's house and requested her "if the law came" to tell that he stayed at her house on Saturday night, and to tell them that she lent him five dollars. He explained that there was a "mess-up" and he was afraid they might try to get him in it.
The defendant first denied the killing, but there is evidence tending to *Page 335 
show that upon being confronted with the brick which was found near the body of the deceased and with other evidence tending to connect him with the killing, he made a voluntary confession, admitting and giving particulars of the killing. This confession, as taken, is as follows:
"I spent Saturday night, October 28, 1939, at my home alone, getting up Sunday morning, October 29, about 7:00 o'clock. I then went to my possum traps about a half mile from home. After passing the first possum trap I picked up a brickbat lying on the side of the road and put it in my pocket. This was the same brickbat Sheriff Tart showed me on Thursday morning. After picking up the brickbat, I turned down a little road leading to an old house sitting in the field where I was born at. I turned there at the yard and looked at a possum trap a short distance from this old house by a persimmon tree. From this trap I cut across the tobacco field, jumped a ditch to another path leading to Mr. William Daniel's home. I went on to Mr. Daniel's home, getting to Mr. Daniel's about 8:00 o'clock, as near as I could guess. Mr. Daniels was in the back of the house fixing breakfast. Mr. Daniels asked me to come in. I went in the back door. Mr. Daniels and I eat breakfast. Mr. Daniels had a piece of a jar of white whiskey sitting on the dining room table. Mr. Daniels offered me a drink, which I took, then Mr. Daniels took a drink. We talked at his home for about an hour. We both took another drink. Mr. Daniels asked me where I was going. I told him I was going over to Charlie Smith's. Mr. Daniels said he believed he would walk over and go to see Mr. Charlie Rouse. We both left there after I had been there about an hour by way of the back door and back porch. Mr. Daniels did not lock up the house or leave from the front way. We walked together down the little path leading from Mr. Daniel's house, turned right about five hundred feet, then turned to out left down a little path leading in the general direction of Mr. Charlie Rouse's home. As we got down the path some one-quarter of a mile, this brickbat I had in my pocket, I took it out, hit Mr. Daniels over the head, knocking him down. The brickbat breaking in half, flying out of my hand, I reached down in the bushes nearby, picked up a limb of cherry wood and then hit Mr. Daniels with the piece of cherry wood three or four times. I did not hit him but one time with the brick. After searching one or two pockets of Mr. Daniels, I found $16.00 folded in a small square bundle in his right watch pocket. This money I removed from his pocket, the denomination of which was two $5.00 bills and six one dollar bills. Mr. Daniels did not say anything to me when I hit him with the brickbat, but as he fell he did make a gurgling sound. After I had hit him three or four times with the cherry limb noticing Mr. Daniels was not struggling, I picked up his hat which had fallen off to one side and placed it on Mr. Daniel's head, the side of his head, *Page 336 
as he lay on the ground in the position he fell. After searching Mr. Daniels I hurried away from the place where I had hit him. The first place I stopped after hitting Mr. Daniels was at Jack Faison's home, staying there about thirty minutes. From there I went to Charlie Smith's about 10:30 o'clock. Of this 16 dollars that I had taken from Mr. Daniels' pocket after I had killed him, I spent as near as I can figure about $3.00 of this money at Charlie Smith's for whiskey. I paid Jack Faison $3.00 of this money that I owed Jack and his sister, Hannah. I loaned Roosevelt Faison $1.25, his brother Rufus $.75 cents, his brother Frank, 75 cents, and lost some three or four dollars skinning Sunday and Sunday night. Monday morning, after spending the night with Colonel James Aycock, I spent fifty cents at Mr. McCleny's filling station about 7:30 o'clock for a gallon of gas, tobacco and cigarettes. When we left the filling station Monday morning, after making these purchases, I with Colonel James Aycock and Ernest Aycock went to my Aunt Delia Smith's, which is a few hundred yards over the Duplin County line. My purpose for going to see Aunt Delia was to ask her if the law came there inquiring for me for her to tell them that I spent Saturday night at her house. Tell them that she loaned me some money too. I told her that there was a mess out and I was afraid they might get it on me. Me, Ernest Aycock, and Colonel James Aycock left Aunt Delia's and came back to Ernest Aycock's. From there I went on over to Charlie Smith's, which is a few hundred yards across the field, where I again got in a skin game and there during Monday lost three or four dollars. I also bought about $1.50 worth of liquor from Charlie Smith. From Charlie Smith's I went to Eve Cox, where the Sampson County officers arrested me some time Monday afternoon. The brickbat that I picked up on the way to my traps and hit Mr. Daniels with and broke in two pieces when shown this same brick in two parts by Sheriff Tart and two other officers on November 3, I took sheriff Tart and these officers to the place where I killed Mr. Daniels and showed them the place where I had thrown the brickbat immediately after hitting Mr. Daniels. I then took the Sheriff and the same two officers to the place and pointed out to them where I had picked this brickbat up from a bunch of weeds on Sunday morning, showing them the imprint in the weeds where the brick had lain. The officers placed this brickbat back in the imprint and showed me that the brickbat fitted in the place where I showed them I picked the brickbat up from. I noticed that Sunday morning near a bridge not far from Mr. Daniels' house a place that a fire had been built. The coals were still hot as I passed going towards Mr. Daniels' home. I do not know who built this fire but the officer showed it to me and I remembered seeing it as I went to Mr. Daniel's house and killed and robbed Mr. Daniels as near as I can figure from *Page 337 
9:00 to 9:30 o'clock. I spent most of Sunday evening at Charlie Smith's drinking and skinning. I went to Eve Cox' home Sunday night where Eve gave me change for one of the $5.00 bills which I had taken from Mr. Daniels. Eve Cox gave me this change, giving me five one dollar bills. Monday morning after my visit and conversation with Aunt Delia, I spent most of Monday evening at Charlie Smith's skinning. From there I went to Eve Cox, where I was later arrested. After I was arrested, I was brought to the jail in Clinton, North Carolina. I told Sheriff Tart in the first conversation with him that I spent Saturday night with Aunt Delia but after I told him I knew he knowed I was telling a story and I told him the truth which was that I stayed at my home Saturday night and did not borrow any money from Aunt Delia."
The voluntariness of this confession was denied by defendant, and, on motion of defendant, evidence was taken in the absence of the jury as to the circumstances under which it was made, upon which its competency was sustained and it was admitted in evidence.
Alve Rouse testified that he knew William Daniel and saw him Sunday, 29 October, 1939, between eleven and twelve o'clock. "He was lying with his hands out and with his head turned down. When I found him I ran every step of the way from there home; I ran in the house and told my mama and daddy about it and they cranked up. I did not see Mr. Daniel any more that day until the sheriff and coroner went back over there with me, then I saw him again. His head was beat up. When I found him there I picked his head up between my fingers and looked at his face — how he was beat up, and I left there running. He was dead at that time. He was in Sampson County, just across the line about 100 yards near the Duplin line, near Warsaw; he was about 300 yards from his house and about one mile from my house. It was not in the woods that I found him; it was in a big field. I didn't see anything on the ground around him at all.
"I didn't see any stick or brickbat. I first went to the place and found him and later went back that afternoon with the sheriff. I went twice before he was moved. His body was warm when the coroner and sheriff got there in the afternoon between 1:00 and 2:00 o'clock. He lived alone. He was a married man with two children but was not living with his wife and children."
This witness further testified that the defendant, Zedikiel Smith, lived about three or four hundred yards from Mr. Daniel's home.
Dr. Royal, the coroner, testified, as an expert, that he had been called on to view William Daniel and did examine him about twelve o'clock noon. He found several lacerations about his face. He had been hit with some instrument that caused lacerations at each lip; had a fracture *Page 338 
of the jaw and a cut on the right upper lip, a cut on the right ear, and a laceration back of the ear, five of them on his head. He was dead. He had been hit about the chest with some instrument like a stick, which caused no lacerations but did cause fracture of his ribs on both sides and his breastbone in front. His skull was fractured. In the opinion of the witness, the fracture was the cause of death.
When he examined the deceased he was lying on his back and a hat had been placed on his face. Witness was of the opinion that he could not have fallen that way. The wounds were in front. There was nothing to indicate a scuffle or that he had moved.
Sheriff Tart testified that he was called to the residence of William Daniel and found Mr. Daniel about 300 yards from his house in a little road leading through the field, dead, with a number of wounds on his head and chest. This witness testified as to the geography of the section around Mr. Daniel's place.
He found a very long track, apparently made with a run-over shoe — an extra long track with a little dent in one of the tracks. The track was not complete; it had a little spot where the dirt was not pressed down; just a little hole on one side of this track on the inside. Witness found a brick near Mr. Daniel's head in the ditch; also a cherry limb with bloodstains on it. (The brick and cherry limb were introduced in evidence.)
This witness testified that he made an investigation and found that Zedikiel Smith had some money and had been spending it freely. Later, witness had a conversation with the defendant in jail. Neither threats nor offer of reward were made, and the defendant was told that any statement he might make would be used as evidence against him. Thereupon, the defendant confessed the killing of Daniel, giving particulars, and signed the above confession.
Witness further testified that he called on the North Carolina State Bureau of Investigation to send some help, and they sent Mr. Scott and Mr. Pierce. "We then taken the prisoner to his Aunt Delia Smith's, that he told me he spend Saturday night there. We took the defendant to his Aunt Delia's. She said in his presence that Zedikiel was there and told her to tell the officers if they came there that he spent Saturday night with her." To this defendant excepted. "She said that Zedikiel came there on Sunday morning and asked her to tell the officers that he spent the night there if they came." Defendant moved to strike out the testimony of this witness. The motion was denied and defendant excepted.
"We then taken him over near the scene of the crime. There I taken the shoes, the suit of clothes, the brick and the stick out of the boot of the car. Zedikiel and Mr. Pierce and Mr. Scott at that time had got *Page 339 
out of the car and come to the back of the car. I asked Zedikiel if the suit was his and he said it was. I asked him if the shoes were his. After hesitating for just a few seconds, he said they were his shoes. Then I asked Zedikiel, after noticing that he was very nervous, I asked him if he was the man that killed Mr. Daniel. He hesitated possibly thirty seconds, perhaps, or longer, and then said that he was. I asked him to show me just where the crime was committed. He took us down a little road leading from Mr. Daniel's house in the direction of Mr. Rouse's house. And he showed us the exact spot that we found Mr. Daniel on Sunday afternoon. I asked him what he hit him with and then he said, `I hit him with the brick one time and the brick bursted' and that he threw it in the ditch and then that he got him a limb and hit him several times. Then I asked him where he got the brick from and he pointed over in the direction of his house; said he picked it up." The defendant showed this witness where he had gotten the brick from and the brick itself fitted the imprint in the dirt. The witness identified the track of defendant by certain marks of the shoes which defendant admitted were his, and the fact that the shoes fitted the tracks. He further testified that he asked the defendant why he killed Mr. Daniel and his reply was that he robbed him, taking two five-dollar bills and six one-dollar bills out of his watch pocket.
It is in evidence that Zedikiel's first statement involved Ernest Aycock and delay was made in writing down the confession until that angle could be cleared up, but that subsequently Zedikiel stated that he wanted to tell the truth and made the statement which had been signed.
H. L. Pierce, connected with the North Carolina State Bureau of Investigation, testified that he was with Sheriff Tart and Mr. Scott on the occasion that the defendant was taken down to the place where Mr. Daniel was alleged to have been killed; that he rode in the rear seat with the defendant and they talked in general about the case in going on out. Nothing was said about any threats or about anything relating to whether "we would get out or not"; nothing whatsoever of the kind. The car stopped in front of Mr. Daniel's home and all got out and went around to the back of the car. The sheriff opened the back of the car and took out a suit of clothes which Zedikiel identified as being his clothes. The sheriff then took the shoes out and dropped them on the ground without saying anything. "We were all standing in a circle. Zedikiel looked at the shoes; the sheriff next took the brickbat out and dropped that on the ground. Zedikiel identified the suit as being his and the sheriff asked him about the shoes, which were then on the ground, and Zedikiel's eyes were fastened on the shoes. After a short hesitancy, he said they belonged to him." After that the sheriff said, "Zedikiel, did you ever see this brickbat before?" and he hesitated a little *Page 340 
and then said "yes, sir," and then he asked him where he had seen it last and he said where Mr. Daniel was killed. That was before we ever left the automobile. No threats of any kind were ever made by anyone. I never heard anything that could be considered like there being doubt as to whether "we would get out of there or not." We were in a grove of two or three oak trees. Mr. Daniel's body was found in a field, not in the woods. The nearest woods were two or three hundred yards from there.
Delia Smith testified that she saw Zedikiel Monday after Mr. Daniel was killed, at her house. That he told her if the law came there for her to tell them that he stayed there Saturday night, "because there was a mess-up and he was afraid they might try to get him in it." She also testified the defendant said: "If they ask you if you lent me any money, you tell them yes, $5.00." That afterwards the sheriff and others brought Zedikiel to her house and she said the same thing in his presence.
The defendant went on the stand and testified substantially that he went to the scene of the killing with the sheriff and others and told them that he "murdered the man." However, he stated on the stand that he did not kill Mr. Daniel and declared that a little before they got to the place the sheriff stopped the car and said: "I am carrying you in here; I don't know where I will get you out or not; I hope them men ain't in here." They then proceeded to the place where the crime was alleged to have been committed.
Defendant admitted that a suit of clothes, some sticks and brickbats, and a pair of slippers were shown him, and that he admitted they were his, but denied that he had even seen the brickbats and sticks before; that a little ways further on the sheriff asked the other two men: "You reckon we better put this piece of rope on him?" and they said, "I reckon so," and he tied the rope in the handcuffs about that time. A little further on, as defendant testified, he was asked: "Don't you know about this brick?" and defendant said "No," and he said: "Yes, you know that this is the brickbat you hit Mr. Daniel with," which defendant denied, and the sheriff replied: "You know you are the one that done it," and "I said I didn't." The defendant testified, after repetition of these questions, he was frightened and admitted the murder. He repudiated the purported confession and explained that he had gotten the money, which he had been using, by sale of his crop.
On cross-examination, the defendant again denied the killing or that he had confessed it, or that he had said anything about Ernest Aycock in connection with it.
H. L. Pierce was returned to the stand for a re-direct examination and was questioned as to the statement of the defendant that they suggested some doubt as to whether defendant "would come out of there or *Page 341 
not." Defendant objected to this. The objection was overruled and defendant excepted. Exceptions Nos. 7, 8, and 9.
The witness testified that the defendant had on a pair of Peerless handcuffs and that there was no rope there. Defendant objected and excepted to this evidence. Exception No. 10.
Other exceptions, 12 to 17, inclusive, relate to instructions given the jury.
The jury returned a verdict of guilty of murder in the first degree, and, thereupon, the court pronounced the sentence of death.
The defendant in apt time, upon the coming in of the verdict, moved to set aside the verdict for a new trial. The motion was denied and defendant excepted. Exception No. 18.
The defendant objected to the judgment and, in apt time, excepted to the same and appealed to this Court.
The defendant took 19 exceptions during the course of the trial, but in his brief abandons all of them except four. Two of these relate to the same subject matter and may be considered together. The other two are to the refusal of the judge to set aside the verdict of the jury and to the rendering and signing of the judgment, and may be considered formal or, rather, fully discussed under the other exceptions.
Defendant claims that the court committed error in admitting in evidence the testimony of Sheriff Tart to the effect that, the defendant having asserted that he spent the time before the homicide at the home of Delia Smith, the witness took him to Delia Smith's house, and that she stated, in the presence of said defendant (we use the language of defendant's brief), "that he (the defendant), came there to her home on Sunday morning and asked her to tell the officers that he spent the night there, if they came."
But, as may be seen in the above statement of the case, there is more to the evidence of this incident than just this. The sheriff testified: "We then taken the prisoner to his Aunt Delia Smith's — that he told me he spent Saturday night there. We took the defendant to his Aunt Delia's. She said, in his presence, that Zedikiel was there and told her to tell the officers if they came there that he spent Saturday night with her."
Delia Smith testified: "I saw Zedikiel Monday after Mr. Daniel was killed. He went to my house. He told me if the law came and asked me did he stay there Saturday night to tell them yes, because there was *Page 342 
a mess up and he was afraid they might try to get him in it, and he said: `if they ask you if you lent me any money, you tell them yes, $5.00.' After that the sheriff and others went back to my house and brought Zedikiel out there in the road and I told them the same thing I have just told you. I told it to them in the presence of Zedikiel. Zedikiel did not say anything. Only the law asked him where he stayed Saturday night and he said he stayed at his home, and that is all I heard him say." To this evidence of Delia Smith, there was no exception. See also defendant's admissions.
Whether the statement as presented in the sheriff's testimony was of an accusatory nature, justifying an unfavorable inference from the silence of defendant, we need not inquire, since the testimony of Delia Smith was substantive and relevant as indicating an attempt on the part of the defendant to frame a defense in advance of accusation, and to account for the money taken from the body of Daniel; and the sheriff's testimony was, in part at least, corroborative of her testimony. The order in which the testimony was admitted becomes unimportant on appeal. Earnhardt v. Clement,137 N.C. 91, 92, 49 S.E. 49; Hamilton v. R. R., 200 N.C. 543,158 S.E. 75; Ripley v. Arledge, 94 N.C. 467. The exceptions to the admission of this evidence are without merit.
For these reasons, also, the objections and exceptions to the refusal to set aside the verdict and to the judgment cannot be sustained.
Although other exceptions in the record are abandoned, we have carefully examined them and find that they disclose nothing that would justify interference with the result of the trial.
We find
No error.