The defendant was tried on a charge embodied in the following two-count bill of indictment:
 "The Jurors for the State upon their oath present, That Robert Strickland, late of the County of Wilson, on the 29th day of December, in the year of our Lord one thousand nine hundred and forty-seven, with force and arms, at and in the County aforesaid, feloniously and infamously, and in secrecy and malice, and with deceit and intent to defraud, did write and transmit a letter, note and writing without signing his true name thereto threatening personal injury, violence and death to one Everett Blake, and using language and threats of a nature calculated to intimidate and place in fear as to his personal safety the said Everett Blake; against the form of the statute in such case made and provided and against the peace and dignity of the State.
 "And the Jurors for the State upon their oath do further present, that Robert Strickland, late of the County of Wilson on the date and year aforesaid, and with force and arms at and in the County aforesaid, feloniously and infamously and in secrecy and malice, and with deceit and intent to defraud, did knowingly send and deliver a letter and writing with menaces and without any reasonable or probable cause demanding of one Everett Blake the sum of $15,000 in cash money, with the intent to extort and gain $15,000 in cash money from the said Everett Blake, against the form of the statute in such case made and provided and against the peace and dignity of the State."
The counts in the indictment are respectively based on G.S., 14-118, denouncing blackmailing, and G.S., 14-394, denouncing the mailing or transmitting of anonymous or threatening letters. *Page 203 
When the case was called for trial the defense counsel moved for a continuance of the case on the ground that time was essential for the preparation of the defense. The motion was declined and defendant excepted.
Motion was then made for a special venire of 50 jurors, which was declined and defendant excepted.
Defendant pleaded "not guilty" and the trial proceeded.
A moderate number of exceptions were taken by defendant — 36 in all. The record, however, is voluminous, and the statement is designed to present those challenges to the validity of the trial which seem to be most important to the appealing defendant.
THE EVIDENCE:
A narrative story of the case, as disclosed in the evidence, presents the following facts in substantive summary:
On the night of December 29, at about 10:45 o'clock, Everett Blake received a telephone call from a then unidentified person whose voice he recognized as a man's, in consequence of which he went to his front door and found upon the mat an envelope containing a letter and a clipping from a newspaper. At the top of the letter was typewritten the words "the spidder" and it reads as follows:
 "Mr. Blake if you wont to live you will do whot this noat says tomarrow at 9 o'clock get $ 15000 ddollors in small bills $ 0 and 100 put this money in a large flower pot then put dirt on top of it then put flowers in it take this money and the flower pot to your wilson cemetery find the grave of luther barnes died oct 22 18 74 feb 17 19 41 you will this grav at the lower end of the cemetery put the money on the grave two oclock tomarrow get in your car drive back to town and dont come back if you do whot i hav said you will get this money back on the 15th. day of january in the place if you dont you wont live long you see whot this man got igave him anote hecall the police now he is dead this is whot you will get if you call the police my men well watch every move you make so be careful watc youdo be wise blake and live a long time if you dont get this money you wont live to spend any more *Page 204 
the place the grave of luther barnes rember oct. 22 . 18.74 15 000 dollors feb. 17. 19.41 i will be looking for you"
The enclosed clipping is a newspaper account of a murder and robbery recently committed in the nearby town of Smithfield.
The letter put Blake in great apprehension and fear, and he immediately called in the local police force, to whom he gave the letter and clipping, who thereafter took charge of the case; and co-operating with them in an effort to detect and apprehend the sender of the menacing letter, he made no immediate compliance with the letter.
On January 3 ensuing, while on his job as manager of J. C. Penny's local store, he was again called to the phone and the caller, being assured he was talking to Blake, inquired if he had gotten that letter. Blake told him he had; and the man said, "you had best follow out those instructions." Blake told him it would be impossible for him to raise $15,000 in cash, and asked him if he would settle for $5,000. The reply was "No. It is $15,000." Blake replied that he could not get up $15,000 that quickly, whereupon the caller said, "You have a child, haven't you?" And Blake said, "Yes." The caller said, "You had better get the $15,000 then," and broke the connection. Blake's fears were enhanced by this message. He immediately communicated with the police and in pursuance of their instructions Blake took a flower pot, with flowers in it, which was supplied by them, found the grave of Luther Barnes as described in the letter, and placed the pot upon it. From that time for a considerable period officers were at his house every evening and all night.
The officers, Privette, Chief of Police, Hartis and Fulghum, kept the grave of Luther Barnes under close and secret observation after the pot of flowers was placed upon it, night and day; part of the time concealed in an undertaker's tent, of the kind used to cover newly made graves.
On Tuesday morning, January 6, while it was yet dark, Hartis was concealed in the tent. The defendant Strickland entered the cemetery through the park, driving a metal-bodied Chevrolet dump truck, and stopped opposite the grave, within 10 feet. The pot had been placed at one end of the grave and he was at the other. He stayed there approximately four or five minutes and drove off in the direction of Pine Street, one of four roads converging near the Barnes grave. About 35 minutes later he returned through Pine Street, "pulled left handed" up to the curbing and stopped briefly; driving off to Hill Street. The same morning about 7:25 he came down Hill Street toward the city dump with a colored man in the car. He had passed through the cemetery. *Page 205 
The third time he appeared he stopped, got out of the truck, and had a conversation with the colored man behind the truck for three or four minutes. The colored boy went off behind the hedges out of sight. The truck turned behind the hedges, and Hartis said, "I couldn't see him after he got past the corner of those hedges, and the boy who was with him went over and got some old wire and came back and threw it in the truck and sat down, and in a few minutes he came and got in the truck and they drove off." Hartis said that Strickland did not go to the flower pot or pick it up.
Arthur Miller and Officer Little were concealed in the funeral tent on the night of January 6. Between 9 and 10 o'clock they observed an automobile drive into the cemetery. It did not stop on its first trip, but proceeded slowly on a right turn around the mound in the vicinity of the Barnes grave. It was gone five or ten minutes, came slowly past and to Pine Street. On a third trip the car came up Hill Street to the cemetery and on into the nearby city dump, stopping some 10 or 15 feet beyond the hedge.
Presently Miller saw someone with a flashlight standing by the car and flashing down by its side. He then started making signals with the light, and Miller then heard a woman talking. They came past the tent walking, but did not at that time come into the tent. They opened one side of it and flashed the light into it. The parties were Strickland and his wife. Miller couldn't tell if they had been drinking. Strickland just stood there until told to go, and they went off in the car. This time it was a Hudson. Jack Little, who was also in the tent, asked Strickland what he was doing out there, and he replied that he was just "walking his wife" to get her sobered. She had no appearance of being intoxicated.
The summary now turns to an expert examination of the alleged extortion letter in comparison with genuine writings on a typewriter which the evidence tends to show belonged to the defendant.
Strickland was arrested on January 18. There was found in a closet in his home a No. 10 Royal typewriter which he admitted was his but appears to have been the property of his wife when they were married. In the same place was a bundle of paid bills, amongst which was a bill to one Baltzegar, typewritten, and with the admitted signature of defendant, and concededly presented by him to Baltzegar. Also the defendant, at request of the officers, wrote at their dictation on the same typewriter, using the "hunt and peck" system, sentences, or matter, containing words misspelled in the extortion letter in which the same peculiar misspelling was duplicated, although, on a later test the same words, in several instances, were properly spelled. Other writings were made on this typewriter, and the lot was sent to the office of the Federal Bureau of *Page 206 
Investigation in Washington, where an expert examination was made, and report returned.
C. W. Brittain, special agent of the Federal Bureau of Investigation, employed in the laboratory as a document examiner, was adjudged to be an expert, and testified in detail as to the writings above described, illustrated his testimony by photographic enlargements, pointing out similar and identical defects of alignment, spacing, depth of impression, and other defects of various type-letters, common to all the specimens, including the extortion letter, and giving it as his opinion that they were written on the same machine, that is the one identified as being taken from the home of the defendant.
The nature and combination of the characteristics pointed out tended to identify the individual or particular machine used in the writings.
The witness also testified to the physical characteristics of the paper and expressed the opinion that the paper used in the extortion note and that used in State's Exhibit "K," the bill defendant presented to Baltzegar and marked "paid in full" and signed by him, were similar, pointing out the similarity in fibre, lining, and watermark.
The several documents mentioned, and the typewriter referred to, were introduced in evidence and exhibited to the jury.
The defendant, testifying in his own behalf, denied his guilt. He explained his presence in the cemetery, on the occasion unaccompanied by his wife, saying that he was going early to the light plant to ascertain if there was any cinder slag which he could use in his concrete business. He said they sold cinders for that purpose and one had to be vigilant to get served. He explained his erratic movements near the Barnes grave by saying he was thinking about something else, turned wrong, and had to stop his truck because the engine, or the shifting gear was cold and required time.
On the night he was accompanied by his wife, he said they both had had too much intoxicants and came there to sober up, so that his wife's people would not discover the condition of his wife when they returned to the apartment.
Mrs. Strickland testified to the same effect, — and stated they went to the tent under the impression that it covered a newly made grave and she wanted to see the flowers.
Several witnesses testified to Strickland's good character.
The defendant, in the order required by the statute, demurred to the evidence and moved for judgment as of nonsuit. The motions were denied and defendant excepted. The jury returned a verdict of guilty on both counts and defendant moved to set aside the verdict for errors of law. Motion overruled, and exception noted. Judgment on the first count that defendant be confined in State's Prison for ten years; on the *Page 207 
second count prayer for judgment continued subject to motion of the solicitor. The defendant excepted and appealed, assigning errors. (Assignments of error not noted in the statement are dealt with specifically in the opinion, where discussion is thought demanded.)
Two preliminary motions made by the defense demand attention: The motion for continuance; and the motion for a special venire. Both of these motions were in the sound discretion of the court. The first, according to the practice of the court, and the second by statute also. (a) S. v. Culberson,228 N.C. 615, 46 S.E.2d 647; S. v. Rising, 223 N.C. 747,28 S.E.2d 221; S. v. Utley, 223 N.C. 39, 25 S.E.2d 195; and (b) G.S., 9-29, G.S., 9-30; S. v. Casey, 212 N.C. 352, 193 S.E. 411; S. v. Levy,187 N.C. 581, 122 S.E. 386. In neither instance is the action of the judge in denying the motion subject to review except upon abuse of discretion. The facts of record in the case at bar do not warrant such a finding.
The attempt at extortion opened up with the telephone call to Blake made by a person then unidentified. In the orderly development of the evidence Blake was permitted over defendant's objection to give the substance of this call. He testified that the party calling him told him there was a letter on his front door mat and said "Never mind" when asked who was calling; and when asked what it was all about, said, "Mr. Blake, the letter is very important; get it and follow instructions." The objection to its admission is on the ground that the person talking was not identified as the defendant. The trial judge subsequently withdrew the conversation from consideration of the jury, leaving only the bare statement in evidence that the witness went to the front door in consequence of a telephone call and there found the letter on the mat. The appellant argues that the prejudicial effect of the admitted conversation was not cured by this withdrawal.
In appraising the effect of incompetent evidence once admitted and afterwards withdrawn, the Court will look to the nature of the evidence and its probable influence upon the minds of the jury in reaching a verdict. In some instances because of the serious character and gravity of the incompetent evidence and the obvious difficulty in erasing it from the mind, the court has held to the opinion that a subsequent withdrawal did not cure the error. But in other cases the trial courts have freely exercised the privilege, which is not only a matter of custom but almost *Page 208 
a matter of necessity in the supervision of a lengthy trial. Ordinarily where the evidence is withdrawn no error is committed. S. v. Davenport,227 N.C. 475, 42 S.E.2d 686; S. v. Artis, 227 N.C. 371,42 S.E.2d 409; S. v. King, 219 N.C. 667, 14 S.E.2d 803; S. v. Stewart,189 N.C. 340, 127 S.E. 260; S. v. Dickerson, 189 N.C. 327, 127 S.E. 256;S. v. Lunsford, 177 N.C. 117, 97 S.E. 682; S. v. Crane, 110 N.C. 530,97 S.E. 682; S. v. McNair, 93 N.C. 628; S. v. Collins, 93 N.C. 564.
We think this rule should apply in the instant case. Moreover, we note here that the evidence thought to be objectionable was substantially put in evidence without objection by the witness Hartis (R., p. 28).
Indeed, it was competent as originally offered. We must bear in mind that the evidence to which the State must resort to convict the defendant is almost wholly circumstantial. The conversation bore internal evidence that the man who called knew about the letter and its contents and was interested in having Blake carry out the instructions; and the inference is that he wrote it and put it where he said it could be found, whoever the caller might be. In cases of this kind, as indeed all cases, the order in which the evidence is developed is within the discretion of the court. When subsequent evidence tended to show the defendant as the writer of the letter that order became immaterial; Stansbury, North Carolina Evidence, Sec. 24, Notes 61, 65; S. v. Smith, 218 N.C. 334, 11 S.E.2d 165; S.v. Guthrie, 145 N.C. 492, 59 S.E. 562; and the manner and circumstances of its delivery became competent. (a) S. v. Anderson, 228 N.C. 720; S. v.Gardner, 228 N.C. 567; S. v. Brown, 226 N.C. 681, 40 S.E.2d 34; S.v. Oxendine, 224 N.C. 825, 32 S.E.2d 648; (b) S. v. Smith, 218 N.C. 334,11 S.E.2d 165; S. v. Alston, 210 N.C. 258, 186 S.E. 354;S. v. Brown, 204 N.C. 392, 168 S.E. 532; S. v. Dale, 218 N.C. 625,12 S.E.2d 556.
The subject of admission of anti-phonal telephone conversations is too broad for detailed treatment here and we are compelled to keep discussion within narrow pertinent limitations. The broad statement that the conversation of a person at the other end is never admissible until he is identified cannot be sustained by authority. It is particularly inapplicable in prosecution for crimes in which secrecy, anonymity and concealed identity are always resorted to as a means of safe accomplishment, and proof is largely circumstantial, especially when the conversation merely forms a part of the res gestae and is offered objectively, as a part of the nefarious scheme. It is only necessary that identity of the person be shown directly or by circumstances somewhere in the development of the case, either then or later. People v. Micelli,156 A.D. 756, 142 N.Y. Supp., 102, 216 N.Y. 727, 111 N.E. 1094
(prosecution *Page 209 
for kidnapping); State v. Twardus, 105 N.J. L., 254, 143 A. 920, 6 N.J. Mis. R., 193, 140 A. 317 (prosecution for conspiracy); 1 R. C. L., p. 447, 71 A.L.R., anno. p. 6; Stansbury, North Carolina Evidence, sec. 96; 11 N.C. L. R. 344.
The cases cited in appellant's brief in support of the exception to the admission of this evidence may be easily distinguished from the case at bar. (a) Powers v. Service Co., 202 N.C. 13, because the conversation stood alone and unaided in its hurtful effect upon the defendant's case, one of civil liability; Sanders v. Griffin, 191 N.C. 447, 451,132 S.E. 157, because the conversation was offered to fix Sanders with the knowledge of the transfer of the note in litigation; inGriffin Mfg. Co. v. Bray, 193 N.C. 350, 137 S.E. 151, because there it was sought to bind Bray in a contract alleged to have been made in the phone conversation, which alone supported plaintiff's case. SeeS. v. Gardner, 227 N.C. 37, 40 S.E.2d 415. Mfg. Co. v. Bray, supra, on which appellant mainly relies, is not at variance with this rule. Speaking for the Court, Justice Brogden quotes with approval fromAtlantic Coast Realty Co. v. Robertson, 135 Va. 247, ". . . the identity of the other party to the conversation may be established by direct or circumstantial evidence." Lumber Co. v. Askew, 185 N.C. 87,116 S.E. 93.
As we have stated, supra, authorities are uniform in holding that the order in which proof may be presented is within the discretion of the court.
On our view of the case, however, the question becomes academic in view of the withdrawal of the offending matter.
The objections to the expert opinion testimony of C. W. Brittain, of the Federal Bureau of Investigation, are not tenable in view of the fact that he was found by the court to be an expert in the matters to which he testified, and the evidence does not disclose to the contrary. The qualification of the witness, imprimis, is a matter for the court, and the character of the testimony given here bears favorably on the discretion exercised by the court as to his qualification. S. v. Smith, 223 N.C. 457,27 S.E.2d 114; S. v. Smoak, 213 N.C. 79, 195 S.E. 72; S. v.Gray, 180 N.C. 697, 104 S.E. 647.
On the demurrer to the evidence and motions to nonsuit, appellant's counsel strongly attack the circumstantial evidence upon which the defendant was convicted and urge also that there is error in the instruction which the judge gave the jury as to the character and effect of such evidence. After having instructed the jury that "circumstantial evidence is not sufficient to justify a conviction if the circumstances are simply consistent with the theory of innocence or guilt; they must be inconsistent *Page 210 
with every reasonable theory and hypothesis except that of guilt," the judge proceeded to charge the jury as follows:
 "The Court charges you that circumstantial evidence is not only a recognized and accepted instrumentality in the ascertainment of truth but that it is essential and highly satisfactory in matters of gravest moment. The facts, their relations, the combinations, connections, should be natural, reasonable, clear and satisfactory; when such evidence is relied upon for conviction it should be clear, convincing in its connections and combinations and should exclude all reasonable doubt of the defendant's guilt. In passing upon such evidence it is your duty to consider all the circumstances relied upon the convict, along with the direct evidence that has been offered in the case; that is to say, if the State produces a witness here and a witness there and offers evidence here and evidence there, you first determine in your mind the particular circumstance to which it relates has been established beyond a reasonable doubt and unless you so find you will not consider it any further, but if you do so find, then you take that circumstance which you find to be established beyond a reasonable doubt in connection with any and all other circumstances which you may find likewise established beyond a reasonable doubt and in the direct evidence offered by the State and put them all together and then if upon that consideration of the evidence as a whole you are satisfied beyond a reasonable doubt of the guilt of the defendant, it is your duty to return a verdict of guilty."
The challenged passage from the charge is entirely consistent with the opinions of this Court giving definitions, illustrations, and analyses of circumstantial evidence, and cannot be held for error. S. v. Ewing,227 N.C. 535, 42 S.E.2d 676; S. v. Gardner, 226 N.C. 310,37 S.E.2d 913; S. v. Kiger, 115 N.C. 746, 751, 20 S.E. 456; S. v. Carmon,145 N.C. 481, 483, 59 S.E. 657; S. v. Vaughn, 129 N.C. 502, 39 S.E. 629; Wigmore on Evidence, 3d Ed., Vol. 9, sec. 2497, p. 316; Wharton's Criminal Evidence, Vol. 2, sec. 922, p. 1608; S. v. McLeod, 196 N.C. 542, 544,146 S.E. 409; S. v. Lee, 213 N.C. 319, 195 S.E. 785; S. v. King,162 N.C. 580, 77 S.E. 301; S. v. Griffith, 185 N.C. 756, 117 S.E. 586; S.v. Casey, 201 N.C. 185, 159 S.E. 337.
We can only reiterate the often repeated statement that the language used by the Court, varied as it may be in phraseology, to illustrate the force and effect of circumstantial evidence as an instrument of proof, is not intended to modify the degree or intensity of proof necessary to conviction. Circumstantial evidence, direct evidence, or a mixture of *Page 211 
both, must induce conviction beyond a reasonable doubt, before the accused may be found guilty.
Exceptions not here discussed have nevertheless been examined and do not merit a retrial of the case. No novel proposition of law is involved and we refrain from detailed discussion.
The evidence here is abundant to support the verdict, and the defendant's motion for nonsuit was properly declined.
We find
No error.